CHAMPION INTERNATIONAL
CORPORATION, Plaintiff,

and

State of North Carolina, ex rel. Department of Natural Resources and Community Development, Intervenor-Plaintiff,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Lee M. Thomas, Administrator, U.S. Environmental Protection Agency; and Jack E. Ravan, Regional Administrator, Region IV, U.S. Environmental Protection Agency, Defendants,

and

State of Tennessee, on Behalf of the Tennessee Department of Health and Environment and the Tennessee Wildlife Resources Agency, Intervenor-Defendant,

and

Pigeon River Action Group; and the Legal Environmental Assistance Foundation, Intervenor-Defendants.

Civ. No. A–C–86–26.

United States District Court,
W.D. North Carolina,
Asheville Division.

Dec. 1, 1986.
Motion for withdrawal of mandate
denied Feb. 3, 1987.

Porter, Wright, Morris & Arthur, Columbus, Ohio by J. Jeffrey McNealey, Michael K. Glenn, Washington, D.C., Redmond, Stevens, Loftin & Currie, Asheville, N.C. by John S. Stevens and Gwynn G. Radeker, for plaintiff.

Alan S. Hirsch & Daniel C. Oakley, Asst. Attys. Gen., N.C. Dept. of Justice, Raleigh, N.C., for plaintiff-intervenor State of N.C.

U.S. Atty. Charles R. Brewer; Asst. U.S. Atty. Clifford Marshall, Asheville, N.C., F. Henry Habicht, II, Asst. Atty. Gen., Land and Natural Resources Div.; Susan L. Smith, Atty., U.S. Dept. of Justice, Land and Natural Resources Div., Environmental Defense Section, Washington, D.C., Jan Taradash, Office of Gen. Counsel, U.S. Environmental Protection Agency, Washington, D.C., Thomas M. DeRose, Office of Regional Counsel, Region IV, U.S. Environmental Protection Agency, Atlanta, Ga., for defendants.

Gary A. Davis, Knoxville, Tenn., Sean Devereux, Asheville, N.C., for defendants-intervenors Pigeon River Action Group and Legal Environmental Assistance Foundation.

State of Tennessee, Office of the Atty. Gen., Nashville, Tenn. by W.J. Michael Cody, Frank J. Scanlon & Michael D. Perigen, Robert W. Spearman, Raleigh, N.C., for defendant-intervenor State of TN.

## MEMORANDUM OF DECISION

SENTELLE, District Judge.

THIS MATTER is before the court on cross-motions for summary judgment. For the following reasons, it appears to the court that the defendants' motions are well taken.

### FACTUAL BACKGROUND

Plaintiff Champion owns a pulp and paper mill located in Haywood County, North Carolina, on the Pigeon River, approximately 26 miles upstream from the North Carolina/Tennessee border. The Pigeon River is a small river with a relatively low annual average stream flow of 48 million gallons per day (MGD). The North Carolina segment of the river is classified as suitable for trout fishing from the source to the Canton water supply intake for the Champion Mill. From the Canton water supply intake to the state line, the river is classified as Class C (secondary recreation and fish propagation). The river below the mill is characterized as a fishery, supporting species that are less sensitive to pollution than trout, such as carp and goldfish.

The intake for the Champion Mill diverts 46.4 million gallons a day and returns approximately 45 million gallons a day. During low flow conditions, the mill diverts virtually all the flow of the Pigeon River.

On June 30, 1981, Champion's state-issued National Pollutant Discharge Elimination System (NPDES) permit for the mill at

# 1392

Canton expired. That permit did not contain any color limitations.

North Carolina took no action on the renewal of Champion's permit until Tennessee and a local citizens' group, Pigeon River Action Group (PRAG), began to lobby North Carolina for action to abate the pollution of the river. In January 1983, Tennessee provided North Carolina with information indicating that discharges from the Champion Mill were violating Tennessee's water quality standards for each designated use. Tennessee requested reissuance or modification of Champion's 1981 permit to address its water quality concerns, noting that the 1981 permit was issued without prior notification of Tennessee pursuant to Section 402(b)(3) of the Clean Water Act.

In February 1983, Tennessee and North Carolina met to discuss appropriate terms for the renewal permit. Subsequent to that meeting, Tennessee developed a model permit for the Champion Mill reflecting the conditions that Tennessee would impose if it were the permitting authority. That permit proposed a limit on increase of apparent in-stream color of 40 color units at the state line. The 40 color unit limit on increased apparent color was ostensibly based on observations of laboratory samples and normal ranges of color in area streams. Tennessee's color standard is in narrative form and contains no numerical limits.

In May 1983, Tennessee requested that North Carolina adopt the model permit. Tennessee renewed this request in June 1983, and in July, requested that the Environmental Protection Agency (EPA) investigate and assist in solving the Champion problem. Also in July, PRAG requested that EPA exercise careful oversight of the renewal of the Champion permit.

At the prompting of Tennessee, representatives of North Carolina, Tennessee and EPA met at EPA regional headquarters during July of 1983. At that meeting, the parties agreed to: (1) develop permit limitations for the mill that would meet the existing water quality standards of the Pigeon River; (2) consult with the company in assessing the technical achievability of the limits; and (3) develop a technically acceptable solution.

To aid in developing the permit limitations, EPA reviewed the general water quality criteria contained in the 1968 water quality criteria book and the 1976 water quality criteria book, as well as specific studies on Pigeon River pollution, to determine what permit conditions would satisfy the color standards of the two states. On the basis of the information available concerning effects of color on fish and aquatic life, and aesthetic quality in the Pigeon River, EPA concluded that an in-stream 50 color unit limit should be reflected in the permit.[1]

North Carolina and the EPA both conducted modeling analyses to determine the actual color removal necessary to meet a 50 color unit in-stream limit at the state line. These modeling analyses ultimately resulted in substantially different color removal figures.[2]

On October 26, 1984, North Carolina gave public notice of a draft permit. Tennessee requested a public hearing on the draft permit to air its objections. The public hearing was held on January 29, 1985. The draft permit conditions on color provided:

On or before April 11, 1985, the company will construct, operate, and maintain a 0.100 MGD ultrafiltration color removal demonstration facility. The company will make all reasonable efforts to achieve successful operation of the demonstration facility with color removal efficiency of 75% based on total effluent flow, if technically feasible.

1. Tennessee had earlier reached approximately the same conclusion. *See* page 1392.

2. The data from EPA's analysis indicated a need for color removal of up to 89%. North Carolina concluded that color removal of up to 35% was necessary. Tennessee's analysis resulted in a recommendation of up to 80% color removal.

On or before April 11, 1986, the Environmental Management Commission shall review the operation of the demonstration facility, both in terms of removal efficiency and cost. If the Environmental Management Commission determines the demonstration facility has been reasonably successful in achieving color reduction, the company shall on or before October 11, 1987, construct, operate, and maintain permanent color removal facilities for the treatment of approximately 2.0 MGD of processed waste water. Company shall make all reasonable efforts to remove at least 75% of total mill effluent color, subject to technical feasibility.

At the hearing, Tennessee presented two major objections to the draft permit. First, it contended that Champion must be required to meet a 75% removal requirement by October 11, 1987. Tennessee argued that North Carolina should not qualify Champion's obligation by requiring 75% removal only if technically and economically feasible through ultrafiltration. Instead, the permit must impose an absolute requirement, requiring Champion to apply for a variance if it determined ultrafiltration was not feasible. Tennessee believed that the variance process would then allow the state to require alternative control techniques.

Second, Tennessee argued that the permit should limit influent color level during low flow. While stating general agreement with the 75% removal target contained in the permit, Tennessee explained that, when the influent contains higher color loadings than usual, 75% might not achieve a 50 color unit level at the state border during low flow conditions. Tennessee recommended specific language defining the flow conditions during which a limit on influent level would apply. In addition to appearing at the public hearing, Tennessee presented detailed recommendations in writing to North Carolina.

In February, EPA submitted adverse comments on the permit. Like Tennessee, EPA was concerned that 75% removal would not achieve a 50 color unit level at the state line unless influent levels remained at 700 to 800 color units.[3] Additionally, EPA requested a permit provision requiring that, if ultrafiltration was not feasible, other color removal techniques be tested until one is found that will meet the 75% removal requirement.

In the interim, North Carolina's water standard was changed to include an aesthetic criterion for the first time. The EPA requested that North Carolina submit a permit provision to meet the amended North Carolina color standard. North Carolina failed to do so; instead, it issued a final permit one month later.

The color limitations in the final permit were identical to those in the draft permit with the exception of the following new paragraph at the end:

> If the Commission determines that the demonstration facility has not been reasonably successful in achieving targeted color reductions, it may order Champion to undertake such additional action as it deems necessary to achieve appropriate color removal within a permit as determined by the Commission. Appropriate color removal is currently considered to be 75% removal of total mill effluent color under present operational practices; however, the degree of appropriate color removal may be subsequently modified by the Environmental Management Commission. Such additional measures may include other color removal processes, methods or techniques which the Commission determines to be technologically and economically feasible. Additional measures may be ordered either singly or in combination. Any order pursuant to this section shall entitle Champion to a hearing in accordance with the procedural requirements specified in G.S. 143–215.4 to contest such order.

---

**3.** The color concentration of effluent discharged by the mill averages 700–900 color units on an annual basis, with variable concentration that may exceed 1200 color units on some days.

North Carolina, however, had failed to notify Tennessee of North Carolina's decision to reject Tennessee's recommendations on the Champion permit as required by Section 402(b)(5) of the Clean Water Act. The state also failed to provide EPA with an opportunity to comment on the final permit prior to issuance as required by 40 C.F.R. § 123.44(a)(b)(j).

On July 18, 1985, EPA notified North Carolina that issuance of the Champion permit despite the objections of EPA violated the NPDES regulations and thus could not be considered a valid permit. Therefore, EPA deemed the May 14, 1985, permit to be a proposed permit as described in the regulations.

On August 6, 1985, EPA formally objected to the May 14, 1985, permit because

(1) The permit did not assure compliance with the North Carolina water quality standards in that it provides no basis for how North Carolina interprets, applies or enforces its narrative color standards (aesthetic quality);

(2) The permit did not require Champion to unequivocally comply with either Tennessee's or North Carolina's standard. If the ultrafiltration demonstration project is unsuccessful, the permit does not require any further color removal and only provides that additional color removal "may" be required;

(3) The permit did not assure compliance with the Tennessee color standard since it does not assure the 50 color unit in-stream limit at the state line will be met when influent values exceed 800 color units at low flows. EPA also noted that it had found North Carolina's reasons for rejecting Tennessee's recommendations to be inadequate pursuant to 40 C.F.R. § 123.44(c)(2), thereby invoking an objection under § 402(d)(2)(a).

Neither North Carolina nor Champion requested the public hearing provided for in 40 C.F.R. § 123.44(e), and North Carolina failed to modify the permit in accordance with EPA's objections pursuant to 40 C.F.R. § 123.44(h)(1). On November 13, 1985, EPA notified Champion that it had assumed permitting authority. This lawsuit ensued.

### ANALYSIS

The issue before this court is whether EPA properly and lawfully objected to the North Carolina issued permit and assumed jurisdiction over the permitting process. The EPA's August 6 objection letter included three separate grounds for objection. If even one of those grounds is proper, then the defendants are entitled to summary judgment.

#### *North Carolina's Color Standard*

Shortly before issuance of the Champion permit, North Carolina adopted and the EPA approved a revised narrative water quality standard for color pursuant to Section 303 of the Clean Water Act:

Colored ... wastes: Only such amounts as will not render the water injurious to public health, secondary recreation or to aquatic life and wildlife or adversely affect the palatability of fish, aesthetical quality or impair the waters for designated uses.

15 N.C.A.C. 2B.0211(b)(3)(f) (1985). Prior to this time, the North Carolina standard did not contain an aesthetic requirement. EPA objected to the Champion permit in part because it failed to assure compliance with North Carolina's revised color standard. *See* Item 7, Administrative Record.

The EPA bases this objection on Section 402(d)(2)(B) of the Clean Water Act, 33 U.S.C. § 1342(d)(2)(B), which allows the Administrator to object to any permit proposed by a state that is outside the guidelines and requirements of the Clean Water Act. *EPA v. State Water Resources Control Board*, 426 U.S. 200, 208, 96 S.Ct. 2022, 2026, 48 L.Ed.2d 578 (1976). An NPDES permit that does not contain conditions adequate to achieve state water quality standards approved under Section 303 of the Clean Water Act is outside the requirements of both the Clean Water Act and

regulations issued under the Act. 33 U.S.C. § 1342(b)(1)(A); 33 U.S.C. § 1311(b)(1)(C); *Trustees for Alaska v. EPA*, 749 F.2d 549, 556–57 (9th Cir.1984). The NPDES regulations issued under the Clean Water Act also specifically require that each NPDES permit contain "any requirements ... necessary to: (1) achieve water quality standards established under Section 303 of the Act." 40 C.F.R. § 122.-44(d)(1). Thus, any permit that fails to contain conditions necessary to achieve water quality standards violates both the Act and 40 C.F.R. § 122.44(d)(1). The Champion permit did not contain or reference North Carolina's color standard. Item 18, Administrative Record. Based on this omission, the EPA has determined that the Champion permit fails to assure compliance with North Carolina's water standard and is therefore outside the guidelines and requirements of the Clean Water Act. This determination is to be given substantial deference and will be disturbed only if it is arbitrary and capricious. *Cleveland Electric Illuminating Co. v. EPA*, 603 F.2d 1, 5–6 (6th Cir.1979). Under the arbitrary and capricious standard, the Supreme Court, in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971), stated:

> [T]he Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency. [Citations omitted.]

■ Under this standard, the EPA's decision was not arbitrary and capricious. The objection was based on a properly promulgated state water standard. 15 N.C.A.C. 2B.0211(b)(3)(f). In its objection letter of August 6, 1985, the EPA carefully outlined the perceived deficiencies in the permit as applied to the North Carolina color standard. In addition, it told North Carolina exactly what additions to the permit would resolve EPA's concerns. Specifically, the EPA objected to the permit because it failed to include the factors to be considered and the methodology to be used by the Environmental Management Commission to judge compliance with the color standard in the permit. Item 7, Administrative Record.

The EPA's objection to a proposed permit must be based on one of several enumerated grounds. 40 C.F.R. § 123.44(c). One of the grounds listed is that "[t]he permit fails ... to *ensure* compliance with any applicable requirement of this part...." 40 C.F.R. § 123.44(c)(1). (Emphasis added.) A review of the color removal section of the permit demonstrates that EPA's concern with *ensuring* compliance is not addressed. Clearly, unless there is some method for measuring compliance, there is no way to ensure compliance. The EPA reasonably reached this conclusion. It considered the relevant factors, *i.e.*, North Carolina's water standard, the terms of the Champion permit and the requirements of the Clean Water Act. There has been no clear error of judgment. *Volpe, supra.* Therefore, EPA's objection was not arbitrary and capricious. Based on this objection, the EPA properly assumed jurisdiction over the permitting process.

■ After the EPA objects, the permitting state (or other interested party) may either request a public hearing or submit a revised permit that meets EPA's objection within 90 days of receipt of the objection. 40 C.F.R. § 123.44(e); 40 C.F.R. § 123.-44(h)(1); 33 U.S.C. § 1342(d)(4). North Carolina's[4] only response to the objection came 92 days after the date of EPA's objection letter. It is not clear whether the response was within 90 days of receipt of the objection. *Id.* However, even if it was within the 90 days, it still does not meet the requirements of 40 C.F.R. § 123.44. That section requires either a request for a public hearing or submission of a revised per-

---

4. Champion did not respond at all.

mit. *See also* 33 U.S.C. § 1342(d)(4). North Carolina's response was simply a letter, not even styled as a revised permit. Item 4, Administrative Record. Therefore, at the expiration of the 90 days, permitting authority passed to the EPA by operation of law. 40 C.F.R. § 123.44(h)(1); 33 U.S.C. § 1342(d)(4). Because EPA's actions with regard to this objection were not arbitrary or capricious, EPA is entitled to summary judgment based on this single objection. However, this court will address the other two objections as well.

### Unequivocal Compliance

The second ground for EPA's objection to the Champion permit was that it did not require Champion to unequivocally comply with either Tennessee's or North Carolina's water standard. By the terms of the permit, Champion is required only "to make all reasonable efforts to remove at least 75% of total mill effluent color, subject to technical feasibility." Item 18, Administrative Record. This requirement is subject to a finding by the North Carolina Environmental Management Commission that the demonstration facility has been reasonably successful, both in terms of removal efficiency and cost. If the demonstration facility is found unsuccessful, the Commission "may" in the future require some unspecified "additional action" to achieve "appropriate" color removal, which is currently considered 75%, but may be changed on the basis of unspecified factors. *See* Item 18, Administrative Record. The EPA contends that, in the absence of a definite obligation to achieve a certain level of color removal that will ensure compliance with both Tennessee's and North Carolina's color standards, the permit fails to satisfy Section 301(b)(1)(C) of the Clean Water Act, 33 U.S.C. § 1311(b)(1)(C).

Again, this court must examine EPA's objection in light of the arbitrary and capricious standard. *Cleveland Electric Illuminating Co. v. EPA, supra,* at 5–6. This court must not attempt to substitute its judgment for that of the EPA. Rather, it " 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Id.,* at 6, *quoting Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824.

■ The EPA did not act arbitrarily and capriciously in objecting to the permit based on its failure to unequivocally require compliance with either North Carolina's or Tennessee's color standards. The EPA is authorized to object to a proposed permit if it does not *ensure* compliance with the requirements of the Clean Water Act, 40 C.F.R. § 123.44(c)(1). Even without going beyond the narrative standards set out by both states, the EPA could reasonably conclude that the permit fails to ensure compliance. The language of the permit is clearly permissive. If the demonstration project is deemed unsuccessful, then the permit does not *require* any further efforts to achieve color removal sufficient to meet the color standards. In objecting on this basis, the EPA considered the narrative color standards of both Tennessee and North Carolina, the terms of the permit and the requirements of the Clean Water Act. Those were the relevant factors, and there has been no clear error of judgment. Therefore, the EPA did not act in an arbitrary and capricious manner and is entitled to summary judgment on this basis.[5]

### The 50 Color Unit Standard

The third basis of EPA's objection was that the Champion permit failed to require compliance with Tennessee's color standard during periods of high influent levels and low flow. The EPA and Tennessee concluded that, to comply with Tennessee's narrative color standard, the Champion permit must contain effluent limitations sufficient to assure that the color of the Pigeon

---

**5.** After EPA's objection, North Carolina and Champion had 90 days to respond either by requesting public hearing or by submitting a revised permit. They did neither, responding only by letter, clearly insufficient under 40 C.F.R. § 123.44(h)(1) and 40 C.F.R. § 123.44(e).

River will not exceed 50 color units at the state line. The EPA further concluded that the conditions in the Champion permit do not assure compliance with the 50 color unit level during low flow conditions when influent levels exceed 800 units.[6] The EPA, therefore, concluded that the permit does not contain effluent limits necessary to comply with Tennessee's narrative color standard and objected to the permit as being outside the guidelines and requirements of the Clean Water Act as well as under the interstate dispute provision.

North Carolina and Champion contend that Tennessee has not adopted, pursuant to Tennessee law, a water quality standard for color of 50 color units and that Tennessee has not adopted, pursuant to Tennessee law, an interpretation of its water quality criteria for color to mean a color limitation of 50 color units. North Carolina's objection was based on the fact that the numerical interpretation of the narrative color standard had not been formally adopted nor subjected to established public hearing process and subsequent review and approval by the EPA as prescribed by Section 303 of the Clean Water Act.

Once again, the standard of review is whether the EPA or Tennessee acted in an arbitrary or capricious manner. *Cleveland Electric, supra.* Using this standard, this court will examine the EPA's (and Tennessee's) decision to apply a numerical interpretation of the narrative standard to the Pigeon River and the EPA's (and Tennessee's) selection of 50 color units as that numerical standard.

■ North Carolina contends that the EPA acted in an arbitrary and capricious manner by applying a numerical color standard to the Pigeon River when Tennessee has enacted only a narrative standard. Clearly, Tennessee's standard is a narrative standard and contains no numerical requirements. However, that fact alone does not establish that the EPA acted in an arbitrary and capricious manner.

In 1974, the EPA identified color as a pollutant of national concern in the pulp and paper industry because of the highly colored effluent resulting from the pulp washing process. Consequently, the EPA promulgated national technology based color effluent limitations for certain segments of the industry. 39 Fed.Reg. 18742 (May 29, 1974). These regulations were upheld in *American Paper Institute v. Train,* 543 F.2d 328, 349–54 (D.C.Cir.), *cert. denied,* 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1976). The EPA withdrew the color limitations in 1982 because it concluded that color was not a problem of *uniform* national concern in the industry and should instead be regulated on a *case-by-case* basis as dictated by water quality requirements. 47 Fed.Reg. 52,014 (Nov. 18, 1982) (emphasis added). Therefore, it is the EPA's stated policy that color standards be determined on a case-by-case basis. The EPA's selection of a color standard applicable only to the Pigeon River is right in line with that stated policy. There has been no clear error in judgment. Therefore, EPA's actions were within the scope of its authority and not arbitrary and capricious. The fact that the EPA selected a *numerical* standard does not change this result.

Obviously, the only way a permitee (in this case, Champion) can adequately comply with the color standard is for the permit to contain explicit and unequivocal direction as to how the company can comply. A numerical requirement accomplishes this result, informing the permitee of exactly what must be done to meet the narrative color standard. In addition, it allows the regulating authority to readily determine if the permitee is complying with the color standard. Thus, the application of a numerical interpretation of Tennessee's narrative standard is not arbitrary and capricious.

Further, the EPA did not act in an arbitrary and capricious manner when it selected 50 color units as that numerical interpretation. After carefully examining the administrative record, this court concludes

---

6. *See* footnote 3, *supra.*

that it contained an adequate basis upon which the EPA could decide that 50 color units was the appropriate limit. The record references a number of reports which support a 50 color unit limit.[7] There is also information in the record which indicates that the National Council on Pulp and Paper determined that a change at 20 color units was perceived by 50% of the people, while a change of 40 color units was perceived by 90% of the people. In addition, there was information in the record that South Carolina has used a 40 color unit standard. Item 51, Administrative Record. Finally, the State of North Carolina, during a meeting with representatives of the EPA and Tennessee, agreed to meet a 40 to 50 color unit level at the state line. Item 49, Administrative Record. The record clearly indicates that the EPA considered the relevant factors. *See Cleveland, supra.* There has been no clear error of judgment and this court will not substitute its judgment for the informed, technical judgment of the EPA. *Id.* The EPA's selection of a 50 color unit standard was not arbitrary and capricious, and it was justified in objecting to the permit as being outside the guidelines and requirements in that the proposed permit failed to ensure compliance. 40 C.F.R. § 123.44(c)(1).

The State of Tennessee also selected 50 color units as the numerical interpretation of its narrative standard. North Carolina contends that the numerical interpretation is invalid because Tennessee has not formally adopted the interpretation through rule-making procedure. The EPA's stated policy is to handle color requirements on a case-by-case basis. 40 Fed.Reg. 52,014 (Nov. 18, 1982). The Fourth Circuit Court of Appeals recently observed:

> When EPA decides to forego general regulations in favor of having limits set by individual permit writers, the Agency has made a considered decision to set particular limitations on a plant-by-plant basis. For this court to deal with the issue ... as if it were a general rule-making matter would be to flout the Agency's approach to the problem.

*Kennecott v. U.S. EPA,* 780 F.2d 445, 457 (4th Cir.1985).

In addition, Tennessee law clearly authorizes this sort of permit limitation.[8] Any permit granted by the Commissioner of the Tennessee Department of Health and Environment is required to include:

> The most stringent effluent limitations and schedules of compliance *either* promulgated by the board, *required to implement any applicable water quality standards,* necessary to comply with an areawide waste treatment plan or necessary to comply with other state or federal laws or regulations.

T.C.A. § 69-3-108(e)(1) (emphasis added).[9]

■ In Tennessee's response, filed at the North Carolina Environmental Manage-

---

7. *See* Items 16, 21 and 50 which reference the following:
   *Water Quality Criteria,* National Technical Advisory Committee to the Secretary of the Interior (1968).
   "Report on the Pollution of the Interstate Waters of the Pigeon River (Tennessee-North Carolina), Federal Water Pollution Control Administration (Feb.1968).
   *Water Quality Criteria,* U.S. EPA (1976).
   Churchill, M., "Natural Reduction of Papermill Color in Streams," *Sewage & Industrial Wastes,* 661 (Vol. 23, No. 5, May 1951).
   There are also references in these items to a 1973 EPA report and a 1979 report prepared by the North Carolina Department of Natural Resources.

8. North Carolina erroneously contends that numerical color limits are not included in other Tennessee permits. In the Bowater Souther Pa-

per Company permit, effective May 1, 1984, Tennessee imposed a 33 color unit increase limit.

9. *See also* Tenn.Gen.Reg. 1200-4-1-.05(4)(d):
   In the application of effluent standards and limitations, water quality standards, and other legally applicable requirements, the Commissioner may, for each issued permit, specify average and maximum daily quantitative limitations for the level of pollutants in the authorized discharge in terms of weight (except pH temperature, radiation, and any other pollutants not appropriately expressed by weight). The Commissioner, may, in addition to the specifications of daily quantitative limitations by weight, specified daily average and daily maximum concentration limits for those pollutants subject to limitation. *In addition, limitations expressed in other terminology may*

ment Commission's public hearing, Tennessee thoroughly substantiated its recommendation of a 50 color unit limit. Item 16, Administrative Record. Tennessee clearly considered the relevant factors, just as the EPA did. Tennessee's selection of a 50 color unit limit was not arbitrary and capricious. There was no clear error of judgment. Therefore, the EPA was also justified in objecting under the interstate dispute provision. 33 U.S.C. § 1342(d)(2)(A).

Neither the EPA nor Tennessee acted in an arbitrary and capricious manner in selecting 50 color units as the limit applicable to Champion's discharge into the Pigeon River. Therefore, EPA's objection was proper under both the interstate dispute provision, 33 U.S.C. § 1342(d)(2)(A), and under the provision of allowing objection when the permit is outside the guidelines and requirements of the Act, 33 U.S.C. § 1342(d)(2)(B). Thus, the EPA is entitled to summary judgment on this basis as well.

### Scope of EPA Permitting Authority

Champion contends that if this court upholds EPA's assumption of jurisdiction (which it does), that jurisdiction should be limited only to the color standard and that the other permit terms should not be changed. This contention is without merit.

■ When the EPA objects to a permit, the state has 90 days to request a hearing or submit a revised permit. If it does neither, the EPA may issue a permit pursuant to 33 U.S.C. § 1342(d)(2) in accordance with the guidelines and requirements of the Clean Water Act. 33 U.S.C. § 1342(d)(4). *See also* 40 C.F.R. § 123.44(c); 40 C.F.R. § 123.44(h)(1).

The permit issued under that section *must* meet all applicable requirements. 33 U.S.C. §§ 1342(a)(1) and (2). It clearly contains no other limit on the EPA's permitting authority once jurisdiction passes to

the Agency pursuant to 33 U.S.C. § 1342(a). The provision of 33 U.S.C. § 1342(d)(2) requiring the EPA to include in the objection letter the limitations and conditions which the permit would include if it were issued by the EPA was obviously intended to instruct the state as to how to resolve EPA's objections, not to require the EPA to construct a model permit at this stage of the proceedings. In fact, the EPA would be acting improperly if it foreclosed *all* changes in the permit even before it obtained permitting authority.[10]

Under 40 C.F.R. § 123.44(h)(3), *exclusive* permitting authority passes to the EPA. "Exclusive" clearly contemplates that EPA obtains complete control over the permitting process. In addition, under 33 U.S.C. § 1342(d)(4), after permitting authority has passed to the EPA, it "may" issue a permit. "May" is clearly permissive and the EPA, with proper justification, could deny the permit application.

There is no provision in the Clean Water Act for partial permits. Either the state or the EPA has authority to issue the permit. Here, that authority has passed to the EPA and that authority is exclusive. The EPA is not limited to consideration of color requirements.

### Specific Objections and Further Review

While it is likely that plaintiffs, particularly Champion, may have specific objections to whatever permit is finally produced, either encompassed within the topics discussed above or in addition thereto, these objections are simply not ripe for discussion nor is this court the proper forum. Section 509 of the Clean Water Act, 33 U.S.C. § 1369, vests the courts of appeals with exclusive jurisdiction to review the Administrator's actions in promulgating new source performance standards, ef-

---

be required when necessary to protect water quality or to describe adequate operation of the treatment facility.
(Emphasis added.)

**10.** The permit program under 33 U.S.C. § 1342(a) is subject to the same requirements as

a state permit program under 33 U.S.C. § 1342(b). 33 U.S.C. § 1342(a)(3). That section requires that the program "... provide an opportunity for public hearing...." 33 U.S.C. § 1342(b)(3).

fluent standards for toxic pollutants, and other similar decisions and, most specifically, in making determinations about the adequacy of state NPDES programs and in issuing or denying NPDES permits. 33 U.S.C. § 1369(b)(1). The legislative history of the 1977 amendments to applicable statutes indicates that Congress contemplated no review until final agency action.[11]

*Motion to Supplement the Record*

The motion is ALLOWED, and the items were considered in reaching this decision.

### CONCLUSION

Based on the foregoing, the EPA is entitled to summary judgment, and a Judgment to that effect will be filed simultaneously herewith.

---

11. "Judicial review arising out of this provision would be in the same manner as judicial review of any EPA issued 402 permit." H.R.Rep. No. 95–830, 95th Cong., 1st Sess. (1977). The Administrative Procedure Act cited by plaintiff as an alternate basis for jurisdiction for this court likewise requires that an agency action be ripe for judicial determination and a final decision.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Therefore, should plaintiffs or either of them have valid objections to EPA's final action once it has exercised its permitting authority, those objections can be raised in the appropriate circuit court of appeals at that appropriate time.