850 F.2d 182
 28 ERC 1013, 57 USLW 2020, 18 Envtl.
L. Rep. 21,372
 CHAMPION INTERNATIONAL CORPORATION, Plaintiff-Appellant,
and
State of North Carolina, Plaintiff,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; Lee M.
Thomas, Administrator, U.S. Environmental Protection Agency;
Jack E. Raven, Regional Administrator, U.S. Environmental
Protection Agency; State of Tennessee, on Behalf of the
Tennessee Department of Health and Environment and the
Tennessee Wildlife Resources Agency; Pigeon River Action
Group; Legal Environmental Assistance Foundation,
Defendants-Appellees.
 No. 87-3529.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 5, 1987.
Decided June 24, 1988.
 
 John Jeffrey McNealey (Michael K. Glenn, Michael G. Dowd, John S. Stevens, Gwynn G. Radeker, Benjamin S. Bilus, on brief) for plaintiff-appellant.
 Blake Andrew Watson, Dept. of Justice (David C. Shilton, Susan L. Smith, Dept. of Justice, W.J. Michael Cody, Atty. Gen., Frank J. Scanlon, Deputy Atty. Gen., Michael D. Pearigen, F. Henry Habicht, II, Asst. Attys. Gen., Robert W. Spearman, Adams, McCullough & Beard, Gary A. Davis, Susan C. Lepow, Gail B. Cooper, E.P.A., on brief), for defendants-appellees.
 Before WIDENER and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 WIDENER, Circuit Judge:
 
 
 1
 This case comes to us on appeal from summary judgment granted in favor of the defendant, United States Environmental Protection Agency (EPA). While we agree with much of the district court's opinion, we are of opinion that judicial review of the merits of EPA's objections is premature, so we vacate the judgment of the district court and remand with instructions to dismiss the case for lack of subject matter jurisdiction.
 
 
 2
 The plaintiff in this action, Champion International Corporation (Champion), has operated a pulp and paper mill in Canton, North Carolina since 1907. The mill is located in Haywood County, North Carolina, on the Pigeon River, twenty six miles upstream from the Tennessee-North Carolina border. The Pigeon River is classified as suitable for trout fishing from its source to the Canton mill. From that point to the river's mouth near Newport, Tennessee, the river is classified as Class C, secondary recreation and fish propagation.
 
 
 3
 The Canton mill diverts 46.4 million gallons per day from the Pigeon River for its pulp and paper production and returns 45 million gallons per day. The average flow of the Pigeon River at Canton is 48 million gallons per day. Thus the Canton mill diverts substantially the entire flow of the Pigeon River, particularly during low flow periods. Because of dissolved solids resulting from the manufacturing process, the Pigeon River has a brown murky appearance below the Canton mill to the Tennessee border and beyond.[1] From the state line, the Pigeon River flows northwesterly until it joins the French Broad River at a point approximately five miles north of Newport, Tennessee. Directly adjacent to the Tennessee border, the land along the Pigeon River is primarily scenic wooded and recreational areas.
 
 
 4
 Until 1981, the Canton Mill operated under a National Pollutant Discharge Elimination System (NPDES) permit issued by the State of North Carolina. This permit was originally issued in 1977. On June 30, 1981, the permit expired. No action was taken concerning the permit until 1983. Champion continued to operate the mill under the guidelines of the expired permit.
 
 
 5
 In January of 1983, Tennessee informed North Carolina that it felt Champion to be in violation of Tennessee water quality standards with respect to uses designated for the Tennessee portion of the Pigeon River. Tennessee requested that any reissuance or modification of the expired permit incorporate its water quality concerns.[2] Tennessee developed a model permit that would satisfy the Tennessee water quality standards and submitted it to North Carolina. In May of 1983, Tennessee requested that North Carolina adopt the model permit and renewed this request in June 1983. Tennessee requested EPA assistance the following month. In September 1983, representatives of Tennessee, North Carolina and the EPA met in order to develop a solution that would meet all guidelines while remaining feasible for Champion.
 
 
 6
 The major area of concern on Tennessee's part, and the only permit requirement at issue in this case, is the amount of color removal necessary for Champion to comply with the Clean Water Act, taking into account Tennessee's legitimate concerns.[3] To that end, each entity conducted a modeling analysis to determine the amount of color removal necessary in order for Champion's discharge to be within limits.[4] At the time the administrative proceeding commenced, Tennessee and North Carolina both had narrative color standards.[5] While the permit application was pending, North Carolina amended its standard to include a limitation which included aesthetic considerations, effective January 1, 1985.
 
 
 7
 A public hearing was held on January 29, 1985, at Tennessee's request, in order to hear objections to North Carolina's draft permit. The two primary objections were, first, that North Carolina did not hold Champion to an absolute standard of 75% color removal but had qualified the standard by linking it to technical and economic feasibility. Second, irrespective of technical feasibility, the 75% removal requirement would not guarantee that water quality standards would be met during the low flow periods on the Pigeon River. In February of 1985, the EPA submitted similar objections to North Carolina.
 
 
 8
 As noted, North Carolina, effective January 1, 1985, during the pendency of the administrative proceeding, amended its water quality standards to include an aesthetic criterion for color.[6] Despite this change, North Carolina did not substantially alter the draft permit nor did it respond directly to the objections of either Tennessee or the EPA. North Carolina instead issued a final permit on May 14, 1985 substantially identical to the draft permit.
 
 
 9
 On July 18, 1985, EPA notified North Carolina that the May 14th permit would be considered to be a proposed permit as defined in the regulations. This was done because North Carolina had not complied with either the Memorandum of Agreement (MOA)[7] or the EPA regulations in that it had not provided EPA with a proposed final permit prior to issuance. On August 6, 1985, the EPA formally objected to the May 14th permit on the grounds that it:
 
 
 10
 1) Did not assure compliance with water quality color standards under 33 U.S.C. Sec. 1311(b)(1)(C), and did not, with certain qualifications, insure a 50 color count standard 26 miles downstream;
 
 
 11
 2) Did not unequivocally require Champion to comply with color standards; and
 
 
 12
 3) Was not an adequate response to Tennessee's objections to the permit for the reasons stated just above.[8]
 
 
 13
 North Carolina did not modify its May 14th permit. North Carolina's only response was a letter stating that it felt the permit complied with all guidelines and that Tennessee's proposed quantitative color limit, for various reasons, should not be accepted. Neither North Carolina nor Champion requested a public hearing on EPA's objections. On November 13, 1985, EPA informed Champion that it had assumed permitting authority.
 
 
 14
 Champion brought this action on January 17, 1986, seeking declaratory and injunctive relief. The gravamen of its complaint was that the EPA's objections to the May 14th permit were invalid and that the EPA was without power to assume permitting authority. It complained of EPA's "... failure to approve ... [the North Carolina] wastewater discharge permit for Champion's Canton ... mill...." On March 20, 1986, the State of North Carolina intervened in the action, substantially adopting the position of Champion.[9] The district court granted summary judgment in favor of EPA. 648 F.Supp. 1390. Champion brought this appeal. The State of North Carolina has not appealed and apparently has acquiesced in the EPA's assumption of permit granting authority in the instance of the permit in question.
 
 
 15
 The goals of the Clean Water Act are achieved primarily through the National Pollutant Discharge Elimination System (NPDES), a nationwide system of issuing permits to individuals and entities that discharge pollutants into United States waters. Discharge of pollutants into waters of the United States is prohibited absent compliance with the Clean Water Act. 33 U.S.C. Sec. 1311(a). NPDES permits may be issued by either the EPA or a State that has been granted permitting authority. 33 U.S.C. Sec. 1342. Once a State has gained approval as a permitting authority by the EPA, it is the initial and primary issuer for its geographical jurisdiction, and the EPA exercises oversight authority. 33 U.S.C. Sec. 1342(c). North Carolina gained issuing authority for NPDES permits in 1975.
 
 
 16
 The EPA's oversight powers were significantly altered by the 1977 amendments to the Clean Water Act. Prior to that time, the EPA could effectively veto a state permit, but could not then issue its own permit. This EPA veto was considered final administrative action subject to judicial review. Crown Simpson Pulp Co. v. Costle, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980). As amended in 1977, 33 U.S.C. Sec. 1342(d) now allows the EPA to take jurisdiction and issue a permit in the event of an impasse between a State and the EPA Administrator.
 
 
 17
 33 U.S.C. Sec. 1342(d)(2) provides two separate grounds for the EPA to object to a state permit. Under 33 U.S.C. Sec. 1342(d)(2)(A), the EPA Administrator may object in the instance of an unresolved interstate dispute. 33 U.S.C. Sec. 1342(d)(2)(B) allows the Administrator to object to a permit which is outside the requirements of the Clean Water Act.
 
 
 18
 The mechanics of the EPA's oversight of North Carolina's permit granting program are contained in the Memorandum of Agreement (MOA) entered into by the State and the EPA. The EPA may object to a state permit for any of the reasons delineated in 40 C.F.R. Part 123.44(c)(1)-(7). If the State does not either resubmit the permit in response to the EPA's objections or request a public hearing within 90 days, issuing authority passes automatically to the EPA. 40 C.F.R. 123.44(h)(1).
 
 
 19
 We must first address the issue of whether the district court should have entertained this suit at all or should have summarily dismissed the same for want of subject matter jurisdiction.[10] We are of opinion the district court had subject matter jurisdiction to entertain the suit under Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), to the extent that it properly inquired whether the EPA had exceeded its delegated authority. When that question was ascertained favorably to EPA, the district court should have gone no further and should have dismissed for want of subject matter jurisdiction to consider the merits of the various objections EPA made to the North Carolina permit. Leedom v. Kyne requires that a federal court ascertain whether an administrative agency is acting within its authority and if the decision is that the agency is within its authority, the court is then required to dismiss the case for want of subject matter jurisdiction when the subject matter is one entrusted to the agency or in which review of the administrative decision has been specifically prescribed by Congress.[11]
 
 
 20
 We think that the district court correctly decided that EPA was within its authority in assuming the permit granting authority under 33 U.S.C. Sec. 1342(d), and we further think that Congress has prescribed review in a court of appeals rather than the district court. We also are of opinion that the objections EPA made to the North Carolina permit were within statutory and regulatory limits, so that, upon its ascertainment that EPA was acting within its authority, the district court should have then dismissed the complaint for want of subject matter jurisdiction. Our reasoning follows.
 
 
 21
 The first question to be answered is whether this is the type of case where an agency has clearly exceeded its delegated powers thus creating an immediate right of judicial review in the district court. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). We recognize that a determination of lack of jurisdiction precludes us from determining the merits of the case. Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 379, 101 S.Ct. 669, 676, 66 L.Ed.2d 571 (1981). The nature of the type of inquiry authorized by Leedom v. Kyne is such that a cursory review of the merits, however, is necessary to determine if the EPA is acting clearly beyond the boundaries of its authority. The facts of this case do not support a conclusion that the EPA has so exceeded its powers.
 
 
 22
 The statute at issue authorizes the EPA to assume issuing jurisdiction in the situation where an impasse has been reached between the EPA and the state authority. The Senate Report indicates the intent of Congress is consistent with EPA's action here
 
 
 23
 EPA has been much too hesitant to take any actions where States have approved permit programs. The result might well be the creation of "pollution havens" in some of those States which have approved permit programs. This result is exactly what the 1972 amendments were designed to avoid. Lack of a strong EPA oversight of State programs is neither fair to industry nor to States that are vigorously pursuing the act's requirements. The committee is concerned that the Agency is not conducting a vigorous overview of State programs to assure uniformity and consistency of permit requirements and of the enforcement of violations of permit conditions. S.Rep. No. 370, 95th Cong., 2d Sess. 73, reprinted in 1977 U.S.Code Cong. & Admin.News 4326, 4398.
 
 
 24
 The even more authoritative Conference Report addressed this as well.
 
 
 25
 There have been occasions under the existing law where the Administrator has objected to the issuance of a State permit, the State has refused to issue a revised permit, and in the absence of effluent limitations for a source specified in a permit, the Administrator has initiated enforcement action against the source seeking particular effluent reductions. This may also have occurred in other cases where a valid permit is not in effect. After the date of enactment of this provision the Administrator is expected to use the authority given by this amendment to issue a permit after objecting to a State-issued permit. Thus any litigation over the degree of effluent reduction required for a source should take place in the context of judicial review of the permit, rather than in the context of an enforcement action.
 
 
 26
 The conferees modified this provision of the Senate bill to establish a procedure for an appeal of an EPA veto[12] of a State permit and to authorize EPA to issue a permit in the event of an impasse. This provision in no way authorizes the Administrator to issue a permit less stringent than required by any State effluent limitations or water quality standards. That authority is specifically preserved in Section 510 of the Act and is not affected by this amendment. Judicial review arising out of this provision would be in the same manner as judicial review of any EPA issued 402 permit. H.R.Conf.Rep. No. 830, 95th Cong., 2d Sess. 73, reprinted in 1977 U.S.Code Cong. & Admin.News 4424, 4472.
 
 
 27
 When we compare the facts of this case to the legislative history of the statute, we see that the EPA has done exactly what Congress intended it to do. The State of North Carolina drafted a permit. Both the State of Tennessee and the EPA objected. North Carolina did not respond to the EPA objections. Neither North Carolina nor Champion requested a public hearing on the validity of the EPA objections. North Carolina did not submit a revised permit in response to the EPA objections. This is in terms the type of impasse that Congress envisioned, and is the setting in which Congress intended that the EPA assume issuing jurisdiction. North Carolina simply failed to exercise its option of appealing the EPA veto by way of a public hearing; neither did it submit a revised permit.
 
 
 28
 Finally, we find support for the conclusion that the EPA has acted properly in International Paper Co. v. Ouellette, (1987). That case dealt with the preemptive effect of the Clean Water Act on common law nuisance actions. The Court noted that the only alternative for an affected downstream State is to "... apply to the EPA Administrator, who has the discretion to disapprove the permit if he concludes that the permit will have an undue impact on interstate waters." Id. at ----, 107 S.Ct. at 811. (emphasis supplied).
 
 
 29
 Again, that is what has happened here. Tennessee complained and the EPA gave heed to the complaint. We need proceed no further in analyzing the merits of Champion's claims, for we are of opinion that EPA's act in assuming the permit issuing authority was consistent with statute and regulation, and the objections it made to the North Carolina permit do not seem to be out of bounds. Even if EPA may ultimately be shown incorrect in its objections to North Carolina's proposed permit (and we do not intimate that they are), its acts are not so clearly outside its authority to subject them to immediate judicial review in the district court.
 
 
 30
 The next question is whether Congress has provided for judicial review of the objections made by the EPA to the North Carolina permit prior to final action by the EPA. We think it has not. In the ordinary case, agency action is reviewable in the district courts under 28 U.S.C. Sec. 1331 unless review has been limited by statute. Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). The EPA's position is that since it has only assumed issuing authority over Champion's permit and has not made any final determination either to issue or to deny a permit, jurisdiction in this case has been specifically limited by statute. EPA also contends that review is precluded by the related judicial doctrines of exhaustion of administrative remedies, ripeness and finality. Because we believe Congress has prescribed a method of judicial review under 33 U.S.C. Sec. 1369(b) in the context pressed here, we do not directly address the other questions.
 
 
 31
 The EPA assumed permitting authority under 33 U.S.C. Sec. 1342(d)(4) which states that:
 
 
 32
 In any case where, after December 27, 1977, the Administrator, pursuant to paragraph (2) of this subsection, objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing, or, if no hearing is requested within 90 days after the date of such objection, the Administrator may issue the permit pursuant to subsection (a) of this section for such source in accordance with the guidelines and requirements of this chapter.
 
 
 33
 The legislative history concerning the 1977 amendments is clear with respect to judicial review of the EPA's decision to assume issuing jurisdiction.
 
 
 34
 It is intended that this process be utilized to insure the rapid issuance of an effective, valid permit. The Administrator's action in objecting to a permit would generally not be subject to judicial review since it will always be followed by further administrative action. The final issuance of a permit by EPA would be subject to judicial review pursuant to section 509(b)(1)(F). Senate Debate (Dec. 15, 1977), reprinted in "A Legislative History of the Clean Water Act of 1970," vol. 3 at 470 (emphasis supplied).
 
 
 35
 This statement was made by Senator Muskie during the Senate debate on the 1977 amendments to the Clean Water Act. As Senator Muskie was the manager of the conference bill in the Senate, his comments have been given significant weight by this court in construing the Clean Water Act in Chesapeake Bay Foundation v. Gwaltney of Smithfield, 791 F.2d 304, 311 n. 13 (4th Cir.1986), vacated, --- U.S. ----, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).[13]
 
 
 36
 Review of the administrator's action is had directly in the appropriate court of appeals under 33 U.S.C. Sec. 1369(b). Prior to the 1977 amendments of the Clean Water Act, the EPA administrator's action in objecting to North Carolina's proposed permit would have constituted a final agency action reviewable by the court of appeals under Sec. 1369(b)(1)(F). Crown Simpson Pulp Co. v. Costle, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980). Prior to 1977, however, the EPA was not empowered to issue its own permit in the instance where a State did not satisfy the EPA's objection. And the Court in Crown Simpson expressly recognized that the 1977 amendments might have impact upon the jurisdictional question. 445 U.S. at 194 n. 2, 100 S.Ct. at 1093 n. 2. Since the EPA clearly intends to continue the administrative process and ultimately issue or deny a permit to Champion, its objection and assumption of issuing authority are not final actions subject to judicial review under the doctrine of administrative finality discussed in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).
 
 
 37
 The effect of the two sections of the Act, 33 U.S.C. Secs. 1342(d)(4) and 1369(b), is to place Champion out of court for either of two reasons. If the action of the EPA was reviewable under Sec. 1369(b), Champion brought its action in the wrong court. If the action of the EPA was not so reviewable and the EPA had yet to act, then Champion has brought its action prematurely. The only alternative left to Champion is to argue, as it does, that the action of the EPA was so outside its statutory authority that the district court was justified in interrupting agency action.
 
 
 38
 Champion argues that even if Senator Muskie's statement is correct, it does not mean that the assumption of issuing authority will never be immediately reviewable under any set of circumstances. For support, Champion relies primarily upon Central Hudson Gas & Elec. Corp. v. United States EPA, 587 F.2d 549 (2d Cir.1978). As that case dealt directly with the issue of whether a State or the EPA had issuing authority for a discharge permit, it may appear, at least facially, to bear on the question at hand.
 
 
 39
 The facts of Central Hudson, however, demonstrate that, as applicable here, it decided no more than that EPA was not acting outside its authority in retaining jurisdiction over the issuing authority for certain permits. In that case, the EPA was in the process of issuing discharge permits to the plaintiffs. In the interim period between the original application to EPA and final issuance of a permit, the EPA approved the status of the New York State Department of Environmental Conservation as an issuing authority for discharge permits. The Clean Water Act provided that once a state program received state approval, the EPA must cease issuing permits. See 33 U.S.C. Sec. 1342(c)(1). The EPA had interpreted this section to mean that no new applications would be accepted by the EPA, but that it could complete any pending applications. Thus the very narrow question presented to the court of appeals was whether applications pending with the EPA at the time approval was given to the New York State Department of Environmental Conservation must be turned over to the jurisdiction of the state agency. The court first found that this was not agency action described in Sec. 1369(b)(1) and thus was not subject to the exclusive jurisdiction of the court of appeals. Thus, the court decided the case was properly brought in the district court. The court went on to hold that prompt and efficient accomplishment of the Clean Water Act's objectives would not be accomplished by transferring permitting authority to the State where the process was nearing completion in the EPA, and that EPA had properly retained jurisdiction.
 
 
 40
 So, beyond the question of whether a state authority or the EPA had permit issuing jurisdiction, Central Hudson bears little resemblance to the instant case and indeed supports our decision here.
 
 
 41
 Champion also cites Ford Motor Co. v. United States EPA, 567 F.2d 661 (6th Cir.1977), and State of Washington v. United States EPA, 573 F.2d 583 (9th Cir.1978), as standing for the proposition that the EPA cannot lawfully object to a state permit unless that permit be clearly outside the guidelines of the Clean Water Act. From this, Champion would infer that an EPA objection to an action of a state permitting authority not clearly outside EPA guidelines is EPA action outside delegated authority. These cases held that EPA vetoes not based on any guideline or regulation were clearly wrong, but in no way purport to hold that the EPA can only object in a situation where the proposed permit is clearly outside the guidelines of the Act. While not establishing the rule of law that Champion seeks, those cases do highlight the issue of whether the district court or court of appeals should initially review vetoes by the EPA of state permits. In similar circumstances involving EPA vetoes based not upon promulgated guidelines but merely on agency determinations, the two circuits reached different conclusions. The Ninth Circuit, in State of Washington, found the district court to be the proper forum, while the Sixth Circuit, in Ford Motor Co., found jurisdiction in the court of appeals under 33 U.S.C. Sec. 1369(b)(1)(F). The Supreme Court's decision in Crown Simpson, its express approval therein of Ford Motor Co., 445 U.S. at 197 n. 9, 100 S.Ct. at 1095 n. 9, and its reversal of the court of appeals in Crown Simpson which had depended on State of Washington, all create substantial doubt as to any continuing validity of State of Washington. See also Republic Steel Corp. v. Costle, 581 F.2d 1228, 1230 n. 1 (6th Cir.1978), cert. denied, 440 U.S. 909 (1979), also approved in Crown Simpson, 445 U.S. at 197 n. 9, 100 S.Ct. at 1095 n. 9. Also, Champion's interpretation would discount the Congressional intent behind the 1977 amendments that the EPA exercise a more rigorous oversight of state issued permits. If EPA objections can be made only when the state permit is clearly in violation of the Act, then EPA's discretion would be circumscribed too markedly to be consistent with the 1977 amendments.
 
 
 42
 Additionally, and of greater consequence, the Conference Report we have referred to above, which, of course, is the most authoritative indication of Congressional intent, contemplates a fact situation very nearly the same as that existing here, namely, EPA's objections to a state issued permit which were not resolved resulting in EPA assuming the permit issuing authority. In such a case, we note the Conference Report provides that "Judicial review arising out of this provision would be in the same manner as judicial review of any EPA issued 402 permit." 1977 U.S.Code Cong. & Admin.News 4326 at p. 4398.
 
 
 43
 As we have demonstrated above, the objections EPA made to the state issued permit were within the regulations concerning the same and were actions of the administrator subject to judicial review in a court of appeals under Sec. 1369(b)(1), if those actions were allowed to proceed to their logical completion, i.e., EPA either granting or denying a permit. The actions of EPA, however, at this stage of the NPDES proceeding are not now subject to judicial review. EPA has neither granted nor denied a permit, so such action is not yet reviewable under Sec. 1369(b)(1). The nature of EPA's objections are well within the contemplation of those it is entitled to make under applicable regulations. 40 C.F.R. Sec. 123.44(c). Whatever may be the result should EPA make an objection completely without its delegated authority, so as to subject that action to present judicial review under Leedom v. Kyne, supra, we have no occasion to consider, for such objections have not been made here.
 
 
 44
 We conclude that the district court properly retained jurisdiction of the case in order to ascertain whether or not EPA acted within its delegated authority. Leedom v. Kyne, supra. Having ascertained that EPA was so acting, however, it should then have dismissed the case for want of subject matter jurisdiction. See Associated Builders, etc. v. Irving, 610 F.2d 1221 (4th Cir.1979). The merits of EPA's objections to the state issued permit may thus be considered on judicial review after EPA either grants or denies a permit, and a review of such EPA action is taken under Sec. 1369(b)(1).
 
 
 45
 While we agree with the tenor of much of the district court's opinion and its action in retaining, for the moment, jurisdiction in the case, so far as the district court addressed the merits of EPA's objections, it was without authority so to do. Those are matters for the court of appeals under Sec. 1369(b)(1).
 
 
 46
 The judgment of the district court will be vacated and the case remanded for dismissal for want of subject matter jurisdiction.
 
 VACATED AND REMANDED WITH INSTRUCTIONS
 
 
 [1]
 The 1979 study conducted by the North Carolina Department of Natural Resources and Community Development lists six minor and two major discharges into the Pigeon River. The study acknowledges, however, that the vast majority of effluent in the Pigeon River can be attributed to Champion. At no point does Champion contest this fact. There are few records of the condition of the Pigeon River prior to the opening of the Champion Mill. Some older residents have been interviewed by defendant-intervenor Pigeon River Action Group. These interviews indicate that the river immediately below Canton was probably of trout stream quality as well prior to 1907
 
 
 [2]
 Tennessee also brought a civil action against Champion seeking injunctive relief under state statutory and common law nuisance theories. That action was ultimately dismissed on the grounds of the preemptive effect of the Clean Water Act. State v. Champion Intern. Corp., 709 S.W.2d 569 (Tenn.1986). Tennessee has expressed concern with the Pigeon River pollution problem since 1945
 
 
 [3]
 The concern with color not only reflects aesthetic considerations, the excess color prevents normal development of the aquatic life in the river
 
 
 [4]
 Tennessee determined that 80% color removal was necessary; the EPA calculated an 89% figure; while North Carolina's standard resulted in a 35% figure
 
 
 [5]
 A narrative standard means a standard without quantitative limits. Tennessee guidelines also provide for the discretionary assignment of quantitative limitations in order to meet the narrative standards. Tenn.Code Ann. Sec. 69-3-108(e); Tenn.Gen.Reg. 1200-4-1.05(4)(d). Tennessee has assigned such quantitative limits in permits for which it was the issuing authority. The Bowater Souther Paper Co. permit, issued May 1, 1984, is one example
 
 
 [6]
 The standard for North Carolina reads:
 Oils: deleterious substances: colored or other wastes; only such amounts as will not render the waters injurious to public health, secondary recreation or to aquatic life and wildlife or adversely affect the palatability of fish, aesthetic quality or impair the waters for only designated uses: North Carolina Rule T15: 002B.021 1(b)(3)(F).
 
 
 [7]
 A Memorandum of Agreement (MOA) is an agreement between the EPA and a State as to the administration of the NPDES permit program. See 40 C.F.R. Sec. 123.24
 
 
 [8]
 We recognize that Tennessee may not impose its standards on North Carolina. It may complain, however, to the EPA, as was done here. International Paper Company, infra, 479 U.S. at ---- - ----, 107 S.Ct. at 810-811
 
 
 [9]
 The State of Tennessee, Pigeon River Action Group (PRAG) and the Legal Environmental Assistance Foundation (LEAF) also intervened as party defendants. PRAG is a citizen conservation group. LEAF is a public interest legal and technical support group
 
 
 [10]
 EPA objected to the jurisdiction of the court in a motion to dismiss and pursues that objection here
 
 
 [11]
 The situation is thus the opposite of, but remarkably similar to, the rule of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), which is to the effect that if a cause of action and jurisdiction of the court depend on the same facts, a case should either be tried or dismissed on the merits rather than for want of subject matter jurisdiction. Here, the courts have authority to inquire whether or not the administrative agency is acting within its delegated authority, and if the agency is so acting, then the court should proceed no further and dismiss for want of subject matter jurisdiction rather than consider the merits
 
 
 [12]
 The procedure for appeal of the EPA objections to a state permit referred to by the Conference Report is the request for public hearing to contest the objections. As noted, neither North Carolina nor Champion availed itself of this opportunity
 
 
 [13]
 Notably, the Supreme Court, in vacating our decision in Gwaltney, went to some length to reconcile its decision with Sen. Muskie's comments rather than merely according them the lesser weight given floor debates. --- U.S. at ----, 108 S.Ct. at 384