**FRIENDS OF THE CRYSTAL RIVER, a Michigan non-profit corporation, National Wildlife Federation, a District of Columbia non-profit corporation, Michigan United Conservation Clubs, a Michigan non-profit corporation, Michigan Council of Trout Unlimited, a Michigan non-profit corporation, and Lake Michigan Federation, an Illinois non-profit corporation, Plaintiffs,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, an Agency of the Federal Government, William K. Reilly, Administrator, U.S. Environmental Protection Agency, LaJuana S. Wilcher, Assistant Administrator for Water, U.S. Environmental Protection Agency, and Roland Harmes, Director, Michigan Department of Natural Resources, Defendants,**

**and**

**Kuras Properties, Inc., a Michigan corporation, Intervenor/Defendant.**

**No. 1:92:CV:325.**

United States District Court, W.D. Michigan.

June 23, 1992.

Mark Van Putten, Counsel, Nat. Wildlife Federation, Great Lakes Natural Resource Center, Ann Arbor, Mich., Robert G. Dreher, Sierra Club Legal Defense Fund, Washington, D.C., M. Carol Bambery, Lansing, Mich., Thomas A. Baird, White, Beek-

man, Przybylowicz, Schneider & Baird, Okemos, Mich., James Mark Olson, Traverse City, John D. Noonan, Rosi, Olson & Levine, PC, Traverse City, Eleanor K. Roemer, Chicago, Ill., for plaintiffs.

Daniel M. LaVille, Asst. U.S. Atty., John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Thomas H. Pacheco, U.S. Dept. of Justice, Environmental Defense Section, Land & Natural Resources Div., Catherine A. Winer, U.S. E.P.A., David J. Kaplan, U.S. Dept. of Justice, Environmental Defense Section, Washington, D.C., Thomas J. Emery, Frank J. Kelley, Atty. Gen., Natural Resources Div., Stephen M. Rideout, Frank J. Kelley, Atty., Gen., Lansing, Mich., for defendants.

Thomas C. Jackson, Fred Wagner, Beveridge & Diamond, P.C., Washington, D.C., Nyal D. Deems, Matthew D. Zimmerman, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., Gregory L. McClelland, Dickinson, Wright, Moon, Van Dusen & Freeman, Lansing, Virginia S. Albrecht, Beveridge & Diamond, P.C., Washington, D.C., for intervenor.

## OPINION

ENSLEN, District Judge.

### I. Introduction

This case is before the Court on plaintiffs' claims for injunctive and declaratory relief under counts I and III of their complaint. Pursuant to section 404(j) of the Clean Water Act, 33 U.S.C. § 1344(j), plaintiffs challenge the legality of the United States Environmental Protection Agency's (EPA) decision to withdraw its longstanding objections to the State of Michigan issuing a "dredge and fill" permit to Kuras Properties, Inc. (Kuras) for the purpose of constructing an 18–hole golf course at the Homestead Resort adjacent to the Sleeping Bear Dunes National Lakeshore in and

around wetlands along the Crystal River in Leelanau County, Michigan.

Plaintiffs filed a three-count complaint. Pursuant to counts I and III, they request declaratory judgments that 1) the EPA exceeded its statutory authority by revoking the U.S. Army Corps of Engineer's (COE) power to issue the permit and withdrawing its objections to the Michigan Department of Natural Resources (MDNR) issuing the proposed permit; and 2) that the MDNR is without federal authority to issue the permit. Plaintiffs also seek to enjoin the MDNR from issuing to Kuras a "dredge and fill" permit. In count II, plaintiffs assert claims that the EPA abused its discretion and arbitrarily withdrew its objections to the proposed permit, for which plaintiffs also seek declaratory and injunctive relief.

Plaintiffs are a group of non-profit environmental protection corporations that I will refer to collectively as the "plaintiffs." Defendants are the United States Environmental Protection Agency; the EPA Administrator, William K. Reilly; the EPA Assistant Administrator for Water, LaJuana S. Wilcher; and the Director of the Michigan Department of Natural Resources, Roland Harmes. Defendant intervenor is the owner of the Homestead Resort, Kuras Properties, Inc.[1]

Pursuant to an agreement between plaintiffs and the MDNR, the Court entered a TRO on May 11, 1992 enjoining the MDNR from issuing a permit to Kuras with the understanding that the Court would reach the merits of counts I and III on an expedited basis. Accordingly, before the Court are plaintiffs' claims for permanent injunctive relief and declaratory relief pursuant to counts I and III of their complaint.[2]

### II. Facts

#### A. The Setting for the Proposed Project

As part of the Homestead Resort, Kuras seeks to build an 18–hole golf course and

1. When addressing the arguments raised by the various defendants, for simplicity sake, I will refer to each argument as though raised collectively by all the defendants.

2. The Court held a hearing on June 8, 1992 and entered an Opinion and Judgment in favor of

plaintiffs on counts I and III of their complaint. This written Opinion is in accordance with the Court's oral Opinion rendered from the bench. To the extent there may be any inconsistency, this written Opinion controls.

related facilities in the lowlands along the Crystal River in Leelanau County, Michigan. Much of the area within the project site is wetland within the jurisdiction of and governed by section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344. Kuras's permit application seeks permission to fill 3-to-4 acres of wetlands, and it is undisputed that the project will involve clear-cutting and earthwork in a broader area of the lowlands. As with most golf courses, it is obvious that it will also involve the long term application of fertilizers, herbicides, pesticides and other substances that will have some continuing impact on the wetlands and water of the Crystal River.

The area is a low and forested wetland and the project would be perched on low ridges contained within this wetland ecosystem. Besides being a wildlife habitat for many species, there is evidence that the high water table is the primary source of drinking water in the area. The Crystal River flows through the Sleeping Bear Dunes National Lakeshore and the Homestead Resort property before entering the waters of the Lakeshore in Lake Michigan. In establishing the National Lakeshore, Congress found "that certain outstanding natural features ... exist along the mainland shore of Lake Michigan ... and that such features ought to be preserved in their natural setting and protected from developments and uses which would destroy the scenic beauty and natural character of the area." 16 U.S.C. § 460x(a). Further, Congress mandated that "[i]n preserving the lakeshore and stabilizing its development, substantial reliance shall be placed on cooperation between Federal, State, and local governments to apply sound principles of land use planning and zoning." *Id.*

### B. The Permit Application Process

Pursuant to section 404(j) of the CWA, 33 U.S.C. § 1344(j), Kuras Properties, Inc., on behalf of the Homestead Resort (Homestead), applied on January 5, 1988 to the MDNR for a state wetlands permit to fill 3-to-4 acres of wetlands. Michigan is party to an agreement with the federal government, pursuant to sections 404(g) & (h) of the Act, to assume administration of the federal "dredge and fill" or wetlands permit program. Subject to federal approval under this agreement, the state is authorized to issue the federal CWA "dredge and fill" permits. As a result, the issuance of the state permit to Kuras by the MDNR is governed not only by state laws and regulations, but also by federal laws and regulations.

Notice of the initial wetland permit application was provided by the MDNR to the EPA on January 22, 1988. On February 10, 1988, pursuant to section 404(j) of the CWA and 40 C.F.R. §§ 233.50(c) & (d), the EPA sent a letter to the MDNR and its Director asserting grounds for federal review of the proposed permit. In that letter, the EPA's Director of the Water Division noted the local concern the proposed project had provoked and the federal concern raised by the fact that the proposed project was to be constructed on lands adjacent to the National Lakeshore. As a result, the EPA Director of the Water Division gave notice to the MDNR that "this project will be the subject of a concurrent federal review for compliance with applicable Section 404 requirements." Exhibit 2 attached to Complaint.

Also on February 10, 1988, the U.S. Corps of Engineers (COE), pursuant to section 404(j) of the CWA and section 233.50(b) of Title 40 of the C.F.R., sent a letter to the MDNR opposing the project. Under the same legal authority, the U.S. Fish and Wildlife Service (FWS) sent a letter to the EPA and advised of its opposition to the project. A public hearing was held on the application on March 9, 1988 and numerous state and national environmental groups attended. On March 17, 1988, the National Park Service sent a letter to the EPA detailing the reasons for its opposition. On July 7, 1988, the EPA's Director of the Water Division sent a letter to the MDNR requesting a denial of the section 404 permit on the grounds that, pursuant to 40 C.F.R. § 230.10(a)(3) of the 404(b)(1) guidelines, the applicant had not adequately evaluated alternative sites and the project involves "a high potential for significant ad-

verse environmental impacts on the site's ecosystem." Exhibit 6 attached to Complaint. On July 12, 1988, the MDNR denied Kuras's application for failing to satisfy the requirements under state law. According to the MDNR, the applicant had failed to demonstrate that: 1) no feasible and prudent dry land alternative existed; and 2) no unacceptable disruption would result to the aquatic resources. Exhibit 7 attached to Complaint.

On July 25, 1988, Kuras filed a petition for a contested case hearing with the MDNR. Then, on October 14, 1988, Kuras filed with the MDNR an amended permit application in response to the MDNR's denial of the original application. Promptly after receiving notice of the amended application and planned public hearing, the EPA Director of Water Division notified the MDNR on or about February 7, 1989 that it objected to the issuance of the permit for essentially the same reasons that it had objected to the original application. The MDNR never requested a hearing or submitted a proposed permit revised to satisfy the EPA's objections. Rather, on February 17, 1989, the MDNR issued a second denial of the permit application.

In August and September 1989, a contested case hearing was held before the state Administrative Law Judge (ALJ) pursuant to state procedures. The ALJ recommended issuing the previously denied permit subject to certain conditions. In early September 1990, the EPA was notified of the MDNR's proposed decision. On September 13, 1990, the Regional Administrator for the EPA, Valdas V. Adamkus, notified the MDNR that the EPA continued to have objections to the issuance of the proposed Homestead permit. Subsequently, on November 14, 1990, the Michigan Natural Resources Commission (Commission), the entity with final state authority to issue or deny the permit following a contested case hearing, adopted the ALJ's proposal for decision, which recommended issuance of the permit subject to certain conditions, and the Commission approved issuance of

the permit by the Director of the MDNR. In response, the Director of the Water Division for the EPA, wrote the MDNR on November 21, 1990 that because the MDNR had not either resolved the EPA's objections or denied the permit, the EPA had "transferred the processing of this permit to the U.S. Army Corps of Engineers" pursuant to federal regulations, 40 C.F.R. § 233.50(j).[3] Exhibit 12 attached to Complaint.

Confirming this transfer, on December 10, 1990, the COE notified Robert Kuras that the EPA had transferred from the MDNR to the COE the authority to process Kuras's application for a federal permit to fill the wetlands. If Kuras desired to pursue a federal permit for the Homestead Resort golf course, the COE directed Kuras to notify the regional office and to supply an updated application and any other materials sought to be considered. In January 1991, the Lt. Governor and the EPA had communications regarding this permit. The EPA confirmed the transfer of the permit process. In a letter to the Lt. Governor dated January 16, 1991, the EPA's Assistant Administrator for Water, defendant Wilcher, confirmed the transfer with the following explanation of the relevant law:

> As provided by Section 404(j) of the Clean Water Act, 33 U.S.C. Section 1344(j), and as set forth in the State–EPA Memorandum of Agreement, MDNR may not issue a wetlands permit to an applicant where EPA has objected to its issuance within 90 days. Where EPA's objections have not been satisfied within certain time frames and conditions, permit issuing authority reverts to the Secretary of the Army. See 33 U.S.C. Section 1344(j) and 40 C.F.R. Part 233.50(j).

Exhibit 14 attached to Complaint.

Kuras never notified the COE of its intention to pursue the permit process on behalf of the Homestead. On the contrary, Kuras wrote to the COE, "We do not believe there is any factual or legal basis for

**3.** In response to the EPA's written objections on February 7, 1989, the MDNR had never requested a hearing or submitted to the EPA a permit revised to satisfy the EPA's objections.

the Corps to require further review or approval of our project." Exhibit 15 attached to Complaint. Rather than any action taken with the COE, the evidence demonstrates that the MDNR and other state officials from the Governor's office pursued negotiations with the EPA. In early 1991, the Michigan governor requested that the EPA Administrator, William Reilly, "review the Homestead Resort permit application decision-making process." Decision document, Exhibit A, Defendant EPA's Brief in Opposition at 8.

In March 1991, the EPA agreed, pursuant to a request from the Michigan Governor's Office, to set up an expert advisory panel to review the dispute regarding the permit application. The EPA assured plaintiff, Friends of Crystal River (FOCR), that any information generated by the process would be provided to the COE, "who would be responsible for acting on a permit application for the Homestead project should one be made with" the COE. The Regional Director of the EPA stated that the purpose of the panel was not to reevaluate its decision transferring permit authority to the COE. Exhibit 16 attached to Complaint. The Regional Director emphasized in his June 25, 1991 follow-up letter:

> The United States Environmental Agency (USEPA) has objected to the proposed federal permit for this activity. As a consequence of that objection, USEPA has transferred authority to the United States Army Corps of Engineers (COE) for purposes of any further Federal permits for construction in these wetlands. The USEPA objection stands until the State of Michigan remedies the defects upon which our objection is based.
>
> I did not, and do not, see this investigation as altering the regulatory process triggered by USEPA's objection to the State permit and the transfer of authority to the COE for any future Federal permits required by Section 404 of the Clean Water Act (CWA).

Exhibit 18, at 1, attached to Complaint. The Regional Director stated that he had

set up the panel to address concerns about water quality impacts on the river that the State admitted remained undetermined and to gather additional information "to facilitate our advice to the COE in the event of any further wetlands permit proceedings in the area." *Id.* at 2. Finally, the Regional Director rationalized the EPA's decision not to make the discussions public with the statement that he did "not intend to use the information provided by the panel to revisit USEPA's objection to the State permit at issue in this matter." *Id.* In August 1991, the advisory panel issued a report generally supporting the EPA's concerns regarding "the short term and long term impacts on wetlands and water quality" that were expressed in the EPA's objections. Exhibit 20, Conclusion, attached to Complaint.

On April 11, 1992, the Regional Administrator of the EPA sent a memorandum to defendant Wilcher. The memorandum "conveys Region V's final assessment of the application for a wetlands fill permit for the Kuras Properties–Homestead Resort golf course project." Exhibit 22, at 1, attached to Complaint. The Regional Administrator stated, "The very minimal modification proposed by the state and developer are simply inadequate to address the concerns raised by the Region and other Federal agencies." *Id.* at 1–2. The Regional Administrator concluded that the permit should not be granted.

Within a few days, on April 16, 1992, the Administrator of the EPA, William K. Reilly, decided to exercise his discretion to withdraw his delegation of authority from the Regional Administrator and to transfer it to the Assistant Administrator for Water. He explained the decision as an effort to centralize federal supervision of the permit process under section 404 of the CWA because "EPA's actions on this application has the potential to affect not only the Section 404 program in Michigan but also our ongoing efforts to encourage other states to assume the 404 program." [4] Exhibit 23 at 1, attached to Complaint.

---

4. At this time, Michigan is the only state that has had approved a state administered permit

On May 8, 1992, the Assistant Administrator for Water issued a "Decision Document" withdrawing the EPA's objections to the MDNR issuing a wetlands permit to Kuras Properties for the construction of the Homestead Resort's golf course. Exhibit A, attached to Defendant EPA's Brief in Opposition to Injunction. According to the Assistant Administrator, this action, although not specifically authorized under the statute, was consistent with the statutory scheme and legislative history. *Id.* at 2. The Assistant Administrator's view of the EPA's role in the state-administered permit process under sections 402 and 404 of the CWA is "to balance objectives and not interfere unduly with State permit programs while still providing Federal authority to protect the environment." *Id.* at 2. After reviewing the environmental studies that have been conducted, the state process, and the regional and national concerns, the Assistant Administrator found: no "conclusive evidence" that the proposed development would have an adverse effect on the National Lakeshore; the MDNR's process for reviewing the application was "appropriate and thorough;" and the MDNR's decision to approve the permit was consistent with environmental concerns for the wetlands and aquatic resources and also consistent with the "partnership" between the EPA and Michigan pursuant to the state-administered permit program. *Id.* at 17–18.

According to plaintiffs, the November 21st letter issued by the Director of the Water Division for the EPA—confirming the objections made by the Regional Administrator of the EPA and notifying the MDNR that it lacked the power to issue the permit because the authority for conducting the permit process had been transferred to the COE—constituted a final, nonrevocable transfer of jurisdiction over the permit decision-making process from the State of Michigan to the U.S. Army Corps of Engineers, pursuant to section 404(j) of the CWA and 40 C.F.R. §§ 233.50(j) & (i). Accordingly, plaintiffs maintain, the EPA lacked the authority to return to the MDNR the power to issue to Kuras Properties a section 404 permit.

### III. Statutory Framework

The Federal Water Pollution Control Act, to which Congress made amendments under the Clean Water Act (CWA) in 1977, is a comprehensive statute designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).[5] The Act prohibits the discharge of any pollutant into waters of the United States except when authorized by a permit or exception under the Act. 33 U.S.C. §§ 1311(a) & 1362(12). The term "pollutant" is defined broadly to include "dredged soil," "biological materials," "heat," "rock," and "sand." *Id.* § 1362(6).

The Act establishes what all the parties recognize as two parallel permitting schemes to ensure compliance with its requirements. Discharges of one class of pollutant—dredged or fill material—into waters of the United States, including wetlands, require a permit under section 404 of the Act. *See, e.g., United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1318 (6th Cir.1974). The National Pollutant Discharge Elimination System (NPDES) permit program is governed by section 402 of the Act and applies to restrict the discharge of other pollutants, primarily from industrial point sources. *See, e.g., E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

Section 404 of the CWA, 33 U.S.C. 1344(f), requires a permit for any activity that will involve the "discharge of dredged or fill material" into the waters of the United States. Pursuant to 33 U.S.C. § 1344(g), Michigan has opted to adminis-

program under section 404 of the CWA.

**5.** Although the CWA does not mention "wetlands" or use language that includes "wetlands," the Supreme Court has defined the "navigable waters" jurisdiction of the COE to include wetlands adjacent to navigable or open waters, even if the wetness is not caused by flooding or ground water flowing from the adjacent waters. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 134–39, 106 S.Ct. 455, 463–65, 88 L.Ed.2d 419 (1985).

ter its own individual and general permit program for the discharge of dredged or fill material into the waters within its jurisdiction. The EPA has approved Michigan's program.[6]

The statutory and regulatory procedures for reviewing and approving "dredge and fill" permit applications submitted to a state, such as Michigan, which has had approved a state administered permit program, are set forth in 33 U.S.C. § 1344(j) and 40 C.F.R. § 233.50. The statute prescribes quite specific procedures and timetables. I will discuss only that part of the provision directly relevant to the issues before the Court in this case.

The Director of the state's agency—in Michigan, the Director of the MDNR—must transmit to the EPA Administrator a copy of each section 404 permit application received and a copy of every state action taken in relation to the application, including the proposed permit the state intends to issue.[7] Within thirty days of receipt, the Administrator must notify the Director if it intends to submit any written comments with respect to the application, and the state may not issue the permit if such notification has been given. The Administrator must then submit to the state those written comments within ninety days of receipt of the application or the proposed permit. If those written comments contain objections to the issuance of the permit on the grounds that it does not come within the guidelines developed by the Administrator and the Secretary of the Army under 33 U.S.C. § 1344(b)(1), the state cannot issue the proposed permit.

Upon receipt of written objections from the Administrator, the state's Director has ninety days in which to request a hearing or resubmit the permit revised to satisfy the EPA's objections. If the Director takes neither of these actions, both the language of the statute and the regulation indicate that authority for issuance of the permit or processing the permit application is transferred from the state to the Secretary of the Army acting through the Chief of the COE. The statute provides if, within ninety days, the Director has not requested a hearing or submitted a revised permit, "the Secretary may issue the permit ... for such source in accordance with the guidelines and requirements of this chapter." *Id.* § 1344(j).[8] The EPA's implementing regulations provide that if the Director does not take the requisite actions within ninety days, "the Secretary shall process the permit application." 40 C.F.R. § 233.50(j). Section 404(c) of the Act authorizes the Administrator to veto the COE's permit "whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and feeding areas),

---

**6.** The MDNR entered into a Memorandum of Agreement with the EPA on November 23, 1983. The Agreement authorizes the MDNR to carry out the policies, regulations and procedures necessary to administer the wetland permit program pursuant to section 404 of the CWA. Exhibit 2, attached to Plaintiff's Reply Brief.

**7.** For all those states that do not have a state administered permit program, the Secretary of the Army and the U.S. Army Corps of Engineers under the authority of the Secretary of the Army, after notice and an opportunity for public hearings, may issue a permit, with conditions if required by the guidelines developed by the EPA. 33 U.S.C. § 1344(a) & (b). However, as with state-approved permits under section 404(j) of the CWA, the EPA Administrator retains authority to deny a permit approved by the COE if it is determined that it will result in certain adverse environmental impacts. *Id.* 1344(c).

**8.** The term "Secretary" refers to the Secretary of the Army, acting through the Chief of Engineers. 33 U.S.C. § 1343(d). The full text of the relevant part of the statute is as follows:

In any case where the Administrator objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing or, if no hearing is requested within 90 days after the date of such objection, the Secretary may issue the permit pursuant to subsection (a) or (e) of this section, as the case may be, for such source in accordance with the guidelines and requirements of this chapter.

33 U.S.C. § 1344(j). Subsections (a) and (e) of section 404 provide for notice and an opportunity for public hearings.

wildlife, or recreational areas." 33 U.S.C. § 1344(c).

## IV. Legislative History

In 1977, Congress enacted in the Clean Water Act numerous amendments to the Federal Water Pollution Control Act. The Senate Committee on Environmental and Public Works noted that since enactment of the 1972 water pollution control provisions, over Presidential veto, implementation "has been uneven, often contrary to congressional intent, and, frequently more the result of judicial order than administrative initiative." Committee on Environment and Public Works reporting on the Clean Water Act of 1977, S.Rep. No. 370, 95th Cong., 1st Sess. 1 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4327 (hereinafter S.Rep. No. 370).

In relation to section 402 of the CWA, which was amended to allow the federal government to take over the permit process when the Administrator had objections and the state refused to issue a permit consistent with the Act, the Committee noted that the "EPA has been much too hesitant to take any actions where States have approved permit programs. The result might well be the creation of 'pollution havens' in some of those States which have approved permit programs." *Id.* at 4398. The Committee called for stronger federal oversight of the state programs "to assure uniformity and consistency of permit requirements and of the enforcement of violations of permit conditions." *Id.* In the conference report on the amendments to the Act, it was noted that an additional purpose of the section 402 amendment was to establish a procedure for an appeal to be taken from the EPA's veto of the State permit, just as an appeal could be taken from any permit issued by the federal agency. H.R.Conf.Rep. No. 830, 95th Cong., 1st Sess. 96–97, *reprinted in* 1977 U.S.C.C.A.N. 4326, 4471–72. *See also Champion Internat'l Corp. v. U.S. E.P.A.,* 850 F.2d 182, 188 (4th Cir.1988) (citing Senate Debate (Dec. 15, 1977), *reprinted in* "A Legislative History of the Clean Water Act of 1970," Vol. 3 at 470) (this process intend-

ed to insure the rapid issuance of an effective, valid permit).

Congress amended section 404 by adding provisions to make it parallel to the state authorized permit program under section 402. *See* S.Rep. No. 370, at 77–78, *reprinted in* 1977 U.S.C.C.A.N. at 4402–05. Congress authorized the section 404 state permit program in accord with the Act's stated policy of " 'preserving and protecting the primary responsibilities and rights of States [to] prevent, reduce, and eliminate pollution.' " *Id.* at 77, *reprinted in* 1977 U.S.C.C.A.N. at 4402. The Committee warned, however, that "[a]lthough discretion is granted to establish separate administration for a State permit program, the authority of the Administrator to assure compliance with guidelines in the issuance and enforcement of permits and in the specification of disposal sites ... is in no way diminished." *Id.* at 78, *reprinted in* 1977 U.S.C.C.A.N. at 4403.

The Committee stated that "[t]he unregulated destruction of [the wetlands] is a matter which needs to be corrected and which implementation of section 404 has attempted to achieve." *Id.* at 10, *reprinted in* 1977 U.S.C.C.A.N. at 4336. However, the drafters of the amendments clearly indicated that some activities warranted federal supervision and control while other activities did not. While recognizing that "the systematic destruction of the Nation's wetlands is causing serious, permanent ecological damage," the Committee stated that certain activities should not be subject to federal control, such as family-run "upland farming, forestry, and normal development." *Id.* The intent of the bill was to "free from the threat of regulation those kinds of manmade activities which are sufficiently de minimis as to merit general attention at State and local level and little or no attention at the national level." *Id.* at 11, *reprinted in* 1977 U.S.C.C.A.N. at 4337.

## V. Plaintiffs' Request for Declaratory Relief and for a Permanent Injunction

Plaintiffs request declaratory relief and the entry of a permanent injunction against

the Director of the MDNR on the grounds that the EPA acted beyond its statutory authority when it withdrew its objections to Michigan issuing a wetlands permit for the Homestead Resort development after the EPA had previously transferred the authority for issuing the permit application from the MDNR to the U.S. Army COE pursuant to 33 U.S.C. § 1344(j). Plaintiffs seek relief pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 702. Section 702 provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." *Id.* The statute clearly and explicitly provides that the United States may be named as a defendant in such an action in a court of the United States, as long as the action is for relief other than money damages. *Id.* Defendants raise a number of preliminary issues that the Court must address prior to reaching the merits of plaintiffs' claims.

Defendants seek to dismiss plaintiffs' claims for lack of subject matter jurisdiction based on several arguments. Defendants argue that the agency action of which plaintiffs seek review was not final and that the statutory scheme set up by Congress mandates review in state court of EPA decisions under section 404(j) of the CWA.[9] Defendants also allege that plaintiffs' claims are unripe and that plaintiffs lack standing. Plaintiffs maintain that there is a presumption that this Court should exercise jurisdiction because: 1) plaintiffs allege that the agency acted beyond its delegated powers; and 2) they allege that the agency deprived them of a specifically delegated statutory right; 3) the Clean Water Act has no scheme for judicial review that precludes jurisdiction; and 4) the federal court must exercise jurisdiction in order to provide plaintiffs an adequate and meaningful forum for protecting that right. Plaintiffs also contend

that the EPA's decision to withdraw its objections constitutes final agency action that is ripe for review and that no other administrative remedy is available.

### A. Jurisdictional Issues

#### 1. Statutory Preclusion of Judicial Review

■ Under section 701(a)(1), the APA precludes judicial review of agency action where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). "It is a well settled principle that where Congress establishes a special statutory review procedure for administrative action, that procedure is generally the exclusive means of review for those actions." *Greater Detroit Resource Recovery Auth. and Combustion Engineering v. U.S. E.P.A.*, 916 F.2d 317, 321 (6th Cir.1990). Whether Congress intended to preclude judicial review is determined by examining the language of the statute, as well as the structure of the statutory scheme, the statute's objective, its legislative history, and the nature of the administrative action involved. *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345, 104 S.Ct. 2450, 2453, 81 L.Ed.2d 270 (1984).

■ Defendants maintain that the CWA precludes judicial review of the EPA's decisions under section 404(j) regarding a proposed state-issued permit on the grounds that the statutory scheme under section 404(j), applicable to any state that has authority to issue a permit, is set up to only allow review in state court, not in federal court, after the state has made its decision whether to issue the permit. I disagree. I find that the CWA does not preclude judicial review of the EPA's "Decision Document."

■ Section 1369(b)(1)(F) provides that review of the Administrator's action taken in issuing or denying a permit under section 1342 of Title 33 of the United States Code may only be had in the appropriate

9. Defendant Harmes, Director of MDNR, also argues that plaintiffs lack subject matter jurisdiction over him to seek the relief sought because he is not a federal agency, official, or employee. However, he is subject to the court's

jurisdiction under 28 U.S.C. § 1331 and section 404 of the CWA because he is the Director of the MDNR which administers the state authorized permit program under the CWA.

court of appeals of the United States. 33 U.S.C. § 1369(b)(1)(F). This provision is not applicable to the EPA's action challenged in this case because the EPA's action was taken under section 1344 of Title 33, which involves a third entity—the COE, and, further, because the action taken by the EPA is not in relation to the EPA issuing or denying the permit, but rather it is in relation to the EPA's authority to delegate to another the power to issue the permit.

A major flaw in defendants' argument, that the statute precludes review until after the state has decided whether to issue the permit, is that plaintiffs contend that, given the procedural facts of this case, the statute's language clearly provides that it is the federal government—the COE—and *not* the state government that has the authority to issue the permit. If the Court were to decline to exercise jurisdiction over this claim until after the state had issued the permit, under defendant's scenario, plaintiffs would likely only have a cause of action in the state courts.[10] However, as discussed *infra*, the state courts would have no jurisdiction over the federal agency to directly challenge the agency's procedural action. Even if plaintiffs did have a cause of action in federal court, very little would be gained by waiting until the state actually issued the permit. The factual record is complete, the authorization for issuance of the permit has already been granted by both the state and federal authorities, and the administrative process is substantively at an end. Moreover, if the EPA's decision transferring to the state the authority to issue the permit is left without review, plaintiffs would have no opportunity to participate in a public hearing, which is statutorily provided when authority to process the permit is transferred under the statute to the COE. Finally, the legislative history of section 404 of the CWA clearly indicates that when the state and the EPA are at an impasse, Congress intended that the federal government as-sume control over wetland permit applications involving more than de minimis risk of adverse environmental impacts in order to assure uniformity and consistency, to promote prompt action, and to provide a means of appeal of the EPA's objections.

■ Even if there were a statutory provision precluding judicial review, I find that plaintiffs' counts I and III claims fall within the limited exception established by the Supreme Court in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). In *Kyne*, the Supreme Court held that where plaintiffs claim that an agency acted beyond its delegable powers by denying a statutorily created right and where plaintiffs have no other means to protect and enforce that right, the statute's "finality" provision does not apply. *Id.* at 190–91, 79 S.Ct. at 184–85. *Kyne* involved the Labor Relations Board's decision to certify a collective bargaining unit consisting of professional and nonprofessional employees. The Board's decision was contrary to an explicit statutory prohibition that "the Board shall not ... decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional unless a majority of such professional employees vote for inclusion in such unit." *Id.* at 185, 79 S.Ct. at 182 (quoting 29 U.S.C. § 159(b)). The Supreme Court found that the statute's finality provision for judicial review did not apply to the claim asserted under those facts because the court action plaintiffs sought was not substantive review of the Board's decision made within its jurisdiction, but rather, a court decision to "strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act." *Id.* at 188, 79 S.Ct. at 183. Moreover, the justices reasoned, if the court did not exercise jurisdiction, the employees would be left with "no other means within their control to protect and enforce that right." *Id.* (citation omitted).

---

**10.** The federal courts have generally declined to exercise jurisdiction over challenges to state-issued permits under section 402 of the CWA. *See, e.g., American Paper Inst. v. U.S. E.P.A.,* 890 F.2d 869 (7th Cir.1989); *District of Columbia v. Schramm,* 631 F.2d 854 (D.C.Cir.1980); *Shell Oil Co. v. Train,* 585 F.2d 408 (9th Cir.1978).

In *Champion Internat'l Corp. v. U.S. E.P.A.*, 850 F.2d 182, 185–86 (4th Cir.1988), the Fourth Circuit relied on *Kyne* in making its preliminary finding that the district court had jurisdiction under the APA to entertain a claim to the extent it alleged that the EPA "had clearly exceeded its delegated powers thus creating an immediate right of judicial review in the district court." [11] *Id.* at 186, 79 S.Ct. at 182. The Fourth Circuit held that when such a claim has been alleged, the district court has jurisdiction to determine whether in fact the agency acted within its statutory authority. According to the Fourth Circuit, if the court finds that the agency acted within its authority, the court should then dismiss the case for lack of jurisdiction "when the subject matter is one entrusted to the agency or in which review of the administrative decision has been specifically prescribed by Congress." *Id.* at 186, 79 S.Ct. at 182.

The Sixth Circuit construes *Kyne* narrowly, holding that it applies only "to jurisdictional defects which are apparent on the face of the record in plain contravention of a statutory mandate." *First Nat'l Bank of Grayson v. Conover*, 715 F.2d 234, 236 (6th Cir.1983) (citing *Dairymen, Inc. v. FTC*, 684 F.2d 376, 379 (6th Cir.1982); *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1093 (6th Cir.1981)). In *Greater Resource Recovery Auth. and Combustion Engineering v. U.S. E.P.A.*, 916 F.2d 317, 323 (6th Cir.1990), the court ruled that in order for the *Kyne* exception to apply, "it must be shown that the action of the agency was a patent violation of its authority or that there has been a manifest infringement of substantial rights irremediable by the statutorily prescribed method of review." The court held in *Greater Resource* that the EPA's actions could not be characterized as a patent violation because the clear language of the Clean Air Act provisions at issue in that case reserved to the EPA the right to enforce the program despite delegation to the state, and the EPA's delegation to the state contained the express reservation of its right to revoke the state's permit authority. *Id.* at 324. Contrary to the facts in *Greater Resource*, the provisions of the Clean Water Act at issue in this case do not reserve to the EPA such broad regulatory rights. Both the provisions of the statute and the implementing regulations themselves provide for a mandatory delegation of permitting authority to the COE, leaving the EPA with no discretionary power to alter that delegation.

■ I find that the EPA's decision, announced in a document entitled, "Decision Document: Conditional Withdrawal of EPA Objection to Michigan Issuance of a State Wetlands Permit for Homestead Resort," is evidence of a patent violation of the statutory mandate that transfers permitting authority from the state to the COE if the state has failed to take action within ninety days of receipt of the EPA's objections. Unlike the statutes involved in *Kyne* and most of its progeny, there is no CWA provision that limits judicial review of agency action allegedly taken under section 404(j). Congress has not set up a scheme of judicial review of alleged violations under section 404(j). Clearly, especially in the absence of an express statutory preclusion of judicial review, there is a presumption in favor of judicial review that can only be rebutted by a showing of clear and convincing evidence that Congress intended to restrict judicial review. *See Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 671–72, 106 S.Ct. 2133, 2136–37, 90 L.Ed.2d 623 (1986) (only clear and convincing evidence of contrary congressional intent can overcome presumption of reviewability).

Defendants have not satisfied this Court that Congress did not intend review of a claim alleging that the EPA has exceeded its authority under section 404(j) by transferring the permitting power back to the

---

11. Defendants argue that the Fourth Circuit's ruling on this issue is merely dicta. I disagree. Before the appeals court could reach the merits of plaintiffs' claim regarding the EPA's decision to assume permitting authority under section 402 of the CWA, the court had to decide whether it had jurisdiction over the claim that EPA had exceeded its statutory authority. *Champion Internat'l Corp. v. U.S. E.P.A.*, 850 F.2d 182, 185 (4th Cir.1988).

state after it had been transferred to the COE pursuant to the statute. I have to presume that Congress intended that the federal courts would exercise jurisdiction over such a claim—where plaintiffs challenge agency action allegedly taken in direct opposition to a specific statutory delegation of authority. *Dart v. United States,* 848 F.2d 217, 223 (D.C.Cir.1988). Without review by this Court, plaintiffs would have no other means to directly challenge the agency's alleged ultra vires conduct because the EPA has not waived its immunity to suit in the state court action. Plaintiffs thus would be denied "meaningful and adequate opportunity for judicial review." *Bd. of Governors of Federal Reserve System v. MCorp Financial, Inc.,* — U.S. —, —, 112 S.Ct. 459, 466, 116 L.Ed.2d 358, 369 (1991). Furthermore, defendants' argument that review by this Court will open the floodgates to future litigation is without merit because review under the facts of this case is limited to a very specific procedural scenario, unlikely to be repeated in many other cases. *Dart,* 848 F.2d at 223.

In this case, section 404(j) of the CWA clearly provides that after receipt of the EPA Administrator's objections, the authority to grant the permit is transferred from the state to the COE if, within ninety days, the state does not request a public hearing or submit a revised permit. The COE may then issue a permit, subject to providing notice and an opportunity for a public hearing pursuant to sections 404(a) & (e). Contrary to this statutory delegation of power, the EPA Assistant Administrator, under the authority of the Administrator, attempted to withdraw the EPA's objections, revoke the COE's authority to decide whether to issue the permit, and transfer the permitting authority back to the state. The statute specifically provides that the permitting authority is transferred to the COE. Nothing in language of the statute implies an authorization for the EPA to revoke the COE's permitting authority and delegate it back to the state once it has been vested in the COE. The legislative history of the amendment to 404(j), providing that the COE assumes authority from the state when it is at an impasse with the EPA, clearly indicates that when an impasse occurs, Congress intended federal control to assure uniform and consistent permit requirements, to promote prompt action on the application, and to provide a means to appeal the federal action in federal court. There is no evidence in the legislative history of the amendment that Congress contemplated a transfer of authority back to the state once the COE had assumed jurisdiction over the permit process. The EPA's action on the face of this record clearly violates its statutorily delegated authority and nothing indicates that this Court should not have jurisdiction to review the EPA's action. Finally, the EPA's action deprives plaintiffs of rights to participate in the COE's process, including the right to public notice and to participate in a public hearing, and plaintiffs have no other avenue to directly challenge the EPA's decision because there is no authority for the state to exercise jurisdiction over the EPA.

### 2. Exhaustion Requirement and Finality of Agency Action

■ Related to the law governing judicial review in the face of a statutory preclusion of review is the finality doctrine and the rule that plaintiffs must exhaust agency remedies before seeking judicial review. Section 704 of the APA provides in relevant part:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review from the final agency action.

5 U.S.C. § 704. The basic purpose of this exhaustion requirement is to enable an administrative agency to perform its statutorily mandated function, apply its special expertise, develop a factual record, and correct its own errors. *Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17 (1972). Nonetheless, the exhaustion requirement "should not be con-

strued to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903, 108 S.Ct. 2722, 2737, 101 L.Ed.2d 749 (1988).

I find that judicial review of plaintiffs' counts I and III claims is not barred by the exhaustion requirement. Insofar as the agency's decision is alleged to have been issued in direct violation of the explicit statutory procedures governing the EPA's authority under section 404 of the CWA, plaintiffs have no forum in which to directly challenge the EPA except in this Court. Allowing judicial review of plaintiffs' counts I and III claims will not subvert the purpose for which the exhaustion requirement is intended because the claims are simply legal in nature and no material factual dispute is involved. Plaintiffs are not challenging the merits of EPA's decision regarding withdrawal of its objections. Rather, in the counts now at issue before this Court, plaintiffs challenge the EPA's authority to transfer back to the state the power to process the permit when, pursuant to the explicit language of the statute, it had previously been transferred to the COE. The purpose of the exhaustion requirement would not be significantly advanced by postponing judicial consideration of a challenge to the EPA Administrator's authority to make such a transfer decision. *Atlantic Richfield Co. v. United States Dept. of Energy*, 769 F.2d 771, 781–82 (D.C.Cir.1985).

■ Additionally, I find no support for construing the EPA's "Decision Document" as anything other than final agency action. The EPA made a final decision to withdraw its objection to the MDNR issuing the permit. Defendants argue that the EPA's Decision Document is a permissible exercise of discretion under the CWA and is not final agency action because the state has not rendered a decision to issue a permit. Plaintiffs maintain that this argument is without any merit because the state agency previously received an authorized mandate to issue the permit and has been working with the EPA merely to receive federal authorization under the CWA.

Defendants provide no indication of what agency action might be taken by the EPA in the future other than some vague allegations contained in a footnote to the EPA's brief. They state that the "EPA may reach accord with the state or correct any mistakes it initially made based upon its further review of the application or proceedings with the state." EPA's Brief in Opposition at 36 n. 26. I am at a loss to determine what future proceedings to which defendants refer. The EPA's Decision Document clearly states that EPA withdraws all its objections to Michigan issuing the permit as long as it includes the conditions that were contained in the preliminary state permit previously submitted to the EPA. Exhibit A at 17, attached to Defendant EPA's Brief. Furthermore, after issuing the Decision Document, the EPA notified the COE that "[t]here is no longer a need for the Corps to process a Federal Section 404 permit for the activity authorized by the State permit." Attachment to Plaintiff's Reply Brief. All the evidence submitted indicates that the state Natural Resources Commission has directed the MDNR to issue the permit in conjunction with the Administrative Law Judge's recommendation. I find no evidence to support finding that if the Decision Document is upheld there will be any future proceedings between the EPA and the MDNR on the permit application at issue in this case.

In support of its argument that the EPA's decision—to withdraw all of its objections to Michigan issuing a wetlands permit—is not final agency action, the EPA cites cases challenging the merits of the EPA's initial decision regarding whether it should enter any objections. *See American Paper Inst. v. U.S. EPA*, 890 F.2d 869 (7th Cir.1989); *District of Columbia v. Schramm*, 631 F.2d 854, 859–62 (D.C.Cir. 1980). These cases are not applicable because review is premised on a substantive analysis of the decision whether to object to the issuance of the permit, where the decision is " 'committed to agency discretion by law.' " *Schramm*, 631 F.2d at 861. Substantive review of the merits of the EPA's objections or its decision not to as-

sert objections to the issuance of the permit is not at issue in the claims now before the Court. Rather, at issue is procedural review and claims challenging the agency's procedural transfer of power as being directly contrary to the express language of the statue. The rationale in *Schramm* and *American Paper*—that the agency action is not complete until actual issuance of the permit—is not applicable to a claim challenging, as being in violation of the clear statutory language, the agency's decision to delegate to another the authority whether to issue the permit.

### 3. Ripeness

■ Defendants also assert the argument that this action is not ripe for review. For many of the reasons discussed in disagreeing with defendants' argument that no final decision has been made, I find that this case is ripe for review.

■ The ripeness doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967); *accord United Steelworkers Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 194 (6th Cir.1988). Application of the ripeness doctrine requires consideration of two basic factors: 1) "the hardship to the parties of withholding court consideration;" and 2) "the fitness of the issues for judicial decision." *Abbott*, 387 U.S. at 149, 87 S.Ct. at 1515; *accord United Steelworkers*, 860 F.2d at 194–96. Pursuant to Sixth Circuit precedent, the Court must first determine whether the issue before it is appropriate for judicial resolution and then assess the hardship resulting from the Court's refusal to review the agency action at issue. *Franklin Federal Savings Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332, 1336 (6th Cir.1991). I find that the issue presented to the Court in plaintiffs' counts I and III claims is ripe for review.

First, as discussed *supra* in relation to the exhaustion and finality requirements, the issue is fit for judicial decision because it is clearly a legal issue, the agency action constitutes "final agency action," and judicial review at this time will not undermine the authority or functions of the EPA. Second, I find that the hardship to plaintiffs should the Court decide not to review the EPA's decision to transfer permitting authority back to the state outweighs any interest the defendants might have in precluding review at this time. For an issue to be ripe, " '[w]hat is required is that the interests of the court and agency in postponing review until the question arises in some more concrete and final form, be outweighed by the interest of those who seek relief from the challenged action's "immediate and practical impact" upon them.' " *Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985); *Diamond Shamrock v. Costle*, 580 F.2d 670, 672 (D.C.Cir.1978). I find that plaintiffs' interest in obtaining review of the EPA's decision to transfer the permit authority back to the state outweighs any interest that the parties might have in postponing review. The controversy is concrete, and, according to all the evidence submitted by the parties, the decision is final. Additionally, the determination of whether the EPA's decision is contrary to its statutory authority is an actual controversy, fit for judicial decision. The issue is purely legal, the challenged agency action is "final" and will have a direct and immediate impact on plaintiffs, and resolution will foster administrative enforcement. *See Alabama Power Co. v. F.E.R.C.*, 685 F.2d 1311, 1315 (11th Cir.1982), *cert. denied*, 463 U.S. 1230, 103 S.Ct. 3573, 3574, 77 L.Ed.2d 1415 (1983). An immediate declaration regarding the state's authority to issue the permit is timely and will limit the possibility of post-permit challenges interfering with effective enforcement by the issuing agency.

The fact that there are pending state court proceedings is irrelevant to the claims before this Court because the state court has expressly ruled that it will only

review the permit process under the Michigan APA and the Michigan EPA. *See* Attachment C, at 2 ¶ 2, attached to Plaintiffs' Reply Brief. Defendants have presented no evidence that federal claims have been asserted in the state court or that the state court has exercised jurisdiction over any federal claims.

### 4. Standing

 Defendants also challenge plaintiffs' standing on the grounds that the issuance of the permit, not the transfer of permit processing, is the cause of injury to plaintiffs.

Standing is, of course, a threshold requirement to any suit. *Haskell v. Washington Township,* 864 F.2d 1266, 1275–76 (6th Cir.1988). The dispute must present " 'a real, substantial controversy between the parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.' " *Id.* at 1275 (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979)). Plaintiff must show a personal injury and an injury that is actual or threatened, can be traced to the challenged conduct, and is likely to be redressible by a favorable decision. *Id.* (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

I find that plaintiffs have standing to bring this suit. The statutory provision at issue is primarily procedural—governing the procedure for processing a permit under a state administered permit program pursuant to section 404 of the CWA. Accordingly, an injury alleged to be threatened or caused by a violation of the procedural provisions of the CWA confers standing. *See Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1514–15 (9th Cir. 1992) (injury from violation of procedural rights under NEPA confers standing), *amended on other grounds,* 956 F.2d 1508 (1992). Moreover, plaintiffs' alleged injury is sufficiently personal and imminent.

Plaintiffs claim two injuries they will suffer should the EPA's Decision Document be allowed to have full effect. First, plaintiffs argue that the allegedly unauthorized transfer of permit processing authority from the COE to the state injures their rights and their members' rights to participate in the COE's review process, including notice and the opportunity to take part in a public hearing, prior to issuance of a permit. Also included in this process, is the right to additional information developed by the COE regarding environmental impact. Moreover, plaintiffs argue that because the state has all but issued the permit, injury to their members' rights to use and enjoy the wetlands and the surrounding area is imminently threatened by the EPA's decision to withdraw its objections and to transfer permitting authority to the state. According to the facts developed in this case, I find that plaintiffs have sufficiently alleged a distinct and actual injury in so far as transfer of the permitting process to the state might result in real estate development with insufficient environmental safeguards to protect the property which their members use and enjoy. *See Trustees for Alaska v. Watt,* 524 F.Supp. 1303, 1307 (D.Alaska 1981) (allegations sufficient to establish standing where plaintiffs allege injury traceable to the fact that delegation to one agency as opposed to another allegedly will lead to regulations with insufficient environmental safeguards), *aff'd per curiam,* 690 F.2d 1279 (9th Cir.1982).

### 5. Abstention

 Finally, defendants have raised the argument that this Court should abstain from exercising jurisdiction over the claims asserted in this case under the *Colorado River* doctrine. I find that the *Colorado River* doctrine does not apply to the claims at issue in this case. In *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 819, 96 S.Ct. 1236, 1247, 47 L.Ed.2d 483 (1976), the Supreme Court approved of dismissing a federal action under extraordinary circumstances in order to avoid duplicative litigation when a state court had exercised concurrent jurisdiction over the claims at issue in the feder-

al action. In this case, there is no evidence that the state court has exercised jurisdiction over any federal claims. In addition, because the federal agency has indicated no intention to waive its immunity to being named as a defendant in state court, the state proceeding may not be adequate to protect the parties' rights. *Nakash v. Marciano*, 882 F.2d 1411, 1415 (9th Cir. 1989). *See also Crawley v. Hamilton County Commissioners*, 744 F.2d 28, 31 (6th Cir.1984) (five factors to consider under *Colorado River:* whether state or federal law governs the outcome; whether either court has exercised jurisdiction over a res; whether the federal forum is less convenient; avoidance of piecemeal litigation; and the order in which jurisdiction was obtained).

For all the reasons discussed, I find that this Court has jurisdiction to rule on plaintiffs' claims under counts I and III of their complaint.

## B. *EPA's Statutory Power to Transfer Permitting Authority*

 Plaintiffs argue that pursuant to the plain language of the statute, exclusive authority to issue the federal "dredge and fill" permit for the Homestead Project is now vested in the COE. Defendants argue, on the other hand, that the EPA has discretion under section 404 to withdraw its objections and to allow the state to resume processing of the Homestead's permit application. According to plaintiffs, the EPA's interpretation is barred by the plain language of the statute and is inconsistent with congressional intent. Defendants also move to dismiss plaintiffs' counts I and III claims pursuant to Rule 12(b)(6) on the grounds that they fail to state a claim for which relief may be granted.[12]

Defendants maintain that "Congress did not enact such an inflexible scheme to preclude EPA from correcting mistakes and unwarranted decisions." EPA's Brief in Opposition at 38–39. This argument has no merit, given the facts before me. First, there has been no claim that the EPA's objections were mistaken or unwarranted in this case. Second, even if there were such a claim, plaintiffs have clearly stated that they do not challenge the procedural right of the EPA to withdraw its objections. What plaintiffs challenge is the agency's procedural right to transfer back to the state the authority to process the permit application, once that authority, pursuant to the statute's explicit language, has been transferred to the COE. Plaintiffs contend that the EPA's transfer is directly contrary to the plain language of the statute and an unlawful extension of the EPA's delegated powers.

The express language of the statute establishes a very specific time-line and procedure for the processing of a permit under section 404 of the CWA. There is evidence that the parties did not strictly comply with the statutory time limits from the date of the EPA's February 10, 1988 notification to the state of its intent to review the permit application and make written comments. However, defendants have submitted no evidence whether the EPA had, at that time, received all of the permit application materials required. Moreover, between February 10, 1988 and the July 1988 written objections, notices of opposition were received from the COE, FWS, and the National Parks Service, and a public hearing was held. After receipt of the EPA's written comments in July, the MDNR made the decision to deny the application. The fact that the EPA did not file its written comments responding to the first application received on February 10, 1988 within the ninety-day deadline is not dispositive because there were no objections made at the time, a public hearing was held, the MDNR itself actually made the decision to deny the permit application, and the objections relevant to plaintiffs' claims are those asserted by the EPA on February 7, 1989 and on November 21, 1990 in response to MDNR's subsequent proposals. Moreover, the EPA has always considered its initial objections timely filed and no dispute as to

---

**12.** Defendants' motion seeks to dismiss plaintiffs' complaint in its entirety, but only counts I

and III are before the Court at this time.

the timeliness of the objections has ever been previously raised by the applicant, Kuras Properties. Exhibit 11, attached to Complaint.

The evidence shows that the EPA was not notified of the subsequent submission of an amended permit application until early 1989 when notice concerning a public hearing was published by the MDNR. Exhibit 8, attached to Complaint. There is no dispute that upon receiving notice, the EPA timely notified the MDNR on February 7, 1989, of its objections in writing, and the MDNR again denied the permit. The MDNR failed to follow the federal statutory procedures for continuing to seek approval by the EPA of the state permit under section 404(j). Within ninety days of the EPA's objections, the MDNR never requested a public hearing or filed with the EPA a permit revised to satisfy the objections. Despite this failure, the MDNR continued working with the EPA, rather than the COE, and conducted proceedings pursuant only to state law.

After receiving the MDNR's proposed decision in the early part of September 1990, the EPA promptly notified the MDNR of its continuing objections. Exhibit 11, attached to Complaint. After issuance of the decision of the Michigan Natural Resources Commission, the EPA notified the MDNR that it had reviewed the entire file, that it continued to have objections to the proposed permit, and that, pursuant to section 404, it had transferred jurisdiction over the processing of the permit to the COE. The COE confirmed the transfer and notified Kuras Properties to continue the application process under its jurisdiction.

It is now clear to the Court that the EPA's notification to the MDNR that it had transferred jurisdiction to the COE indicates that the EPA did not view either the September 1990 proposed decision or the Michigan Natural Resources Commission's November 1990 decision as a new permit application, but rather as a renewal of the 1989 proposal. Even if the EPA had viewed either one as a new permit application, the MDNR failed to take the action

necessary under section 404(j) to maintain jurisdiction over the permit process. By February 19, 1991, ninety days after the EPA's November 21st written objections, the MDNR had not requested a hearing or submitted a permit revised to satisfy the EPA's objections.

The Court must defer to the statutory interpretation of the agency empowered to enforce the statute if the interpretation "is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes*, 474 U.S. 121, 132, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985). The rules of statutory construction require me to look to the language of the statute first and "ask whether Congress has spoken on the subject before us." *Norfolk & W.R. Co. v. American Train Dispatchers Ass'n*, —— U.S. ——, ——, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95, 106 (1991). " 'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' " *Id.* (quoting *Chevron U.S.A. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. The *Chevron* court noted that to the extent that Congress has left any gaps, the agency empowered to administer the congressionally created program is authorized to formulate policy and make rules to fill those gaps. *Id.* "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782.

I find that the statute clearly and unambiguously establishes that if the state does not take certain actions within specified time limits, the authority for processing the permit transfers from the state to the COE. In the words of Congress, if the state does nothing, "the Secretary [mean-

ing the COE] may issue the permit pursuant to subsection (a) or (e)." 33 U.S.C. § 1343(j). Subsections (a) and (e) require the Secretary to give notice and the opportunity for public hearings. *Id.* § 1343(a) & (e). The only limitation on this delegation of authority to the COE is contained in subsection (c), which provides that the Administrator of the EPA may veto the COE's issuance of a permit if the Administrator finds that the permit will result in certain adverse environmental impacts. *Id.* § 1343(c).

I find that the statute, on its face, clearly and unambiguously delegates the permitting authority to the COE. The statute provides only one clear exception where the EPA can veto or prevail over the COE after the permitting power has been transferred to the COE, and that exception is not applicable given the facts of this case.[13] The explicit deadlines and language of section 404(j) make Congress's solution for an impasse between a state and the EPA unmistakably clear: prompt and final transfer of permitting authority to the COE. The EPA's own implementing regulations support this view. The regulations mandate that if the state does not act within the time limits, "the Secretary [meaning the COE] *shall* process the permit application." 40 C.F.R. § 233.50(j) (emphasis added).

Pursuant to this explicit delegation of authority, the EPA initially transferred authority over the processing of the permit to the COE and provided proper notice of the transfer. Now, more than 1-½ years later, the EPA seeks to transfer the authority back to the state. I find that this transfer is contrary, not only to the clear and unambiguous language of the statute, but also to the clear language of the EPA's own regulations.

Moreover, that Congress did not intend such action is also revealed by the fact that no alternative provision for public notice and an opportunity for public hearings is included in the statute. Congress explicitly provided for public notice and an opportunity for public hearings after the power transfer to the COE. If Congress had intended that the EPA could transfer power back to the state at a later date, certainly it would have made some provision for public notice and an opportunity for public hearings prior to authorizing the state to issue the permit. Defendants' argument that they were acting within their agency discretion is completely without merit. In the words of the Supreme Court, "[A]dministrative interpretation of a statute contrary to language as plain as we find here is not entitled to deference." *Demarest v. Manspeaker*, 498 U.S. 184, ——, 111 S.Ct. 599, 112 L.Ed.2d 608, 616 (1991).

What the defendants argue is that anytime the EPA decides to withdraw its objections to a proposed permit, for whatever reason, it retains the power under the statute to transfer authority for processing the permit back to the state. Even if it could be argued that the statute implied such power where neither the state nor the applicant had taken any action to pursue an application before the COE, that power is contrary to legislative history. The legislative history clearly indicates that when the EPA and the state are at an impasse over the issuance of a wetlands permit, the power to process the permit should be transferred to the federal government. At the time that Congress provided for such a transfer of power, Congress was clearly concerned by a lack of federal supervision and the need for consistency in the federal "dredge and fill" permits involving activities having more than de minimis impact on the wetland environment. Congress also intended to provide a means to promptly appeal the federal agency's action. There is absolutely no indication in the legislative history that Congress ever envisioned the authority being transferred back to the state.

The EPA and Kuras Properties argue that a ruling in favor of defendants would place an undue burden on what has already

---

**13.** Subsection (q) provides that to prevent delay, duplication, and needless paperwork in the issuance of permits, the EPA Administrator must enter agreements with the heads of other departments and agencies. This subsection, also, is not applicable to the facts of this case.

been a very time consuming, expensive, and burdensome process. That this application process has been time consuming and expensive is obvious. That it has been unduly burdensome may be so, but perhaps part of the burden has been the result of defendants' own choices. More than a year and a half has passed since the EPA submitted to the MDNR its written objections to the conditional permit as approved by the ALJ and the EPA affirmatively transferred the permit authority to the COE. It was the decision of the defendants not to timely pursue the permit process under the auspices of the COE as directed by the statute. The EPA decided to appoint an independent panel of experts, conduct proceedings, and review the panel's findings without public notice and an opportunity to be heard. Having chosen to act outside the authority of the statute and the mandates of Congress, I do not have too much concern for the burden suffered by defendants.

 Declaratory and injunctive relief are proper remedies. In order to grant declaratory relief, three requirements must be satisfied: 1) there must be an actual controversy between the parties; 2) the issue must be ripe for judicial review; and 3) the threat of injury to plaintiff must be actual and not speculative. *Abbott,* 387 U.S. at 148–154, 87 S.Ct. at 1515–18. As discussed *supra,* the issue of whether the EPA exceeded its statutory powers when it transferred permitting authority from the COE back to the state is an actual controversy, involving the threat of a real injury to the plaintiffs. It is ripe for review and will not interfere with agency process. Moreover, the alleged injury is imminent and irreparable to the extent that plaintiffs claim and have demonstrated that the permit proposed by the state and now approved by the EPA will not be the subject of public hearings and will not contain sufficient environmental safeguards to protect plaintiffs' use of and aesthetic interests in the property. *See Amoco Production Co. v. Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (environmental injury can seldom be remedied by money damages and is often of long dura-

tion). The Assistant Administrator of the Water, in the Document Decision, did not assert that the applicant had satisfied or resolved the EPA's objections. Rather, she stated that upon review, she found that the state's processing of the application was satisfactory and no substantial federal interests were at stake. Defendants have submitted no proofs demonstrating that Kuras Properties resolved the COE's objections submitted on initial review of the application. In so far as there are no proofs that the objections were resolved, I find that the environmental injury claimed by plaintiffs is imminent and irreparable.

Accordingly, for all these reasons, it is my decision that judgment should be granted in favor of plaintiffs and against defendants on counts I and III of plaintiffs' complaint. I declare that the May 8, 1992 Decision Document granting a conditional withdrawal of EPA objection to Michigan's issuance of a state wetlands permit for the Homestead Resort is an unlawful attempt to revoke the U.S. Army Corps of Engineer's statutory authority pursuant to section 404(j) of the CWA, 33 U.S.C. § 1344(j). Pursuant to section 404(j) of the CWA and 40 C.F.R. § 233.50(j) of the EPA's implementing regulations, the authority to process the Kuras Properties, Inc.'s section 404 application for a "dredge and fill" permit resides with the U.S. Corps of Engineers. Accordingly, I grant a permanent injunction against issuance of a federal section 404 wetlands permit by the MDNR.

Finally, I will certify the order entered on counts I and III of plaintiffs' complaint as a final judgment and stay plaintiffs' claims under count II pending appeal of the judgment, should an appeal be sought. At the hearing on May 11, 1992, the parties agreed to certification as a final judgment my rulings on counts I and III, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Given the voluminous record that the Court would have to review in order the resolve plaintiffs' count II claims, I find that there is no just reason for delay.